# THE WESTERN MARYLAND RAILROAD COM-
## PANY *vs.* JOHN B. MARTIN.

*Water Overflowing Land and Houses Caused by a Railroad Em-*
*bankment With Culvert of Insufficient Size—Unusual*
*Freshet—Measure of Damages—Diversion of Under-*
*ground Water by Filling up Spring—Photo-*
*graphs as Evidence.*

When a railroad company constructs an embankment across a
valley through which a stream of water flows it is bound to
provide a proper outlet or culvert of ample capacity to carry
off all the water likely to be in the stream, so that the water,
in times of usual flood, may not be made to overflow the
adjacent land.

Defendant railway company constructed a fill or embankment
across a ravine through which a small creek ran, and a cul-
vert at the crossing of the creek with an opening of ninety-
six square feet. Plaintiff owned a farm adjacent to the em-
bankment on the upper side, which was rented to a tenant.
During a storm and freshet the opening of the culvert became
choked and jammed with a large quantity of debris which
had been carried down the creek, and this was kept in posi-
tion for several hours by a large piece of timber, which was
wedged across the mouth of the culvert. The water thus
dammed up flowed back over plaintiff's farm, depositing upon
it quantities of mud, destroying the corps there growing, and
also flowing into the dwelling houses, where it rose to a
height of five or six feet, damaging the furniture. In an ac-
tion to recover damages for the injury so caused to plaintiff's
reversionary interest the evidence was conflicting as to
whether the culvert was properly located and of sufficient
size to carry off all the water in times of ordinarily severe
storms, and also as to whether the freshet on the day in ques-
tion was such as might have been anticipated, or was an un-
usual and extraordinary one. *Held,* that the evidence entitles

the plaintiff to recover if the jury find that the culvert so constructed was of insufficient capacity to carry off the water which defendant might reasonably have anticipated would be in the creek and the depression through which it ran, or that the culvert was improperly located, as well as of insufficient capacity.

*Held,* further, that since plaintiff's farm was rented, his right to recover for the injury to the land and houses should be limited to the damage to his reversionary interest.

In an action to recover damages for the flooding of plaintiff's land, caused by defendant's construction of an embankment across a valley or creek with a culvert of insufficient size to carry off all the water in times of freshet, a prayer instructing the jury that they may allow the plaintiff such sum as will compensate him for the injury they may believe he has suffered from such cause is too general and indefinite, since it fails to instruct the jury in respect to what elements, and within what limits, damages may be estimated.

In this action, the evidence showed that the water which defendant caused to overflow plaintiff's property injured furniture in the houses and crops on the submerged land, which was in the possession of a tenant. *Held,* that the measure of damages as to the furniture would be its value if destroyed by the flood, or, if merely damaged, the cost of repairing it; that so far as the injury to the land and houses was permanent, the measure of damages is the depreciation in the value of plaintiff's reversionary interest in them, and in so far as it affects the use of the farm, not extending beyond the term of the tenancy, plaintiff would not be entitled to damages, unless he was required by the lease to make good to his tenant injuries of that character; and that, as to the injury to the crops, only the tenant could recover damages, unless it be shown that the plaintiff was entitled to a share of them.

A large spring on plaintiff's land was flooded by water ponded back over the land by defendant's construction of an embankment with an insufficient culvert, and a deposit of mud several feet deep was left in the spring when the water receded. Before the flow of water into the spring was restored, wet places and springs of water appeared all over a meadow, only

half of which had been flooded, and about ten acres of the meadow was turned into a marsh. *Held,* that since the evidence does not show .that the spring was supplied by water flowing in a fixed channel or in a uniform direction, or that the appearance of water in the unflooded portion of the meadow was the result of the stopping up of the spring, plaintiff is not entitled to recover damages for the injury from the appearance of water in any part of the land not actually submerged by the freshet.

A party is not liable for causing a diversion of water running underground, unless such water was accustomed to flow in a fixed channel or in a uniform direction.

A photograph of a locality is not admissible in evidence, unless accompanied by proof that it is an accurate representation of the locality at some particular time.

*Decided June 1st, 1909.*

Appeal from the Circuit Court for Frederick County (HENDERSON and MOTTER, JJ.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, WORTHINGTON and HENRY, JJ.

*Milton G. Urner* and *Benjamin F. Crouse* (with whom were *Benj. A. Richmond* and *Charles A. Little* on the brief), for the appellant.

*A. C. Strite and Chas. D. Wagaman* (with whom were *Reno S. Harp* and *H. Dorsey Etchison* on the brief), for the appellee.

SCHMUCKER, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Circuit Court for Frederick County for damages in an action on the case for nuisance. The suit was brought in Washington County and removed for trial to Frederick County where the judgment appealed from was obtained.

The cause of action was an alleged injury to a farm and buildings owned by the appellee arising from the ponding back of water thereon caused by the construction, across a steam and ravine, by the appellant railroad company of an embankment with a culvert of insufficient size for the passage of the waters of the stream and ravine in times of ordinary freshets. The farm was rented to a tenant and was in his possession at the time of the injury complained of and at the trial of the case, and the cause of action set out in the declaration is distinctly declared to be the injury to the plaintiff's "reversionary interest" in the property. The immediate injury to the property was done during a freshet occurring on the afternoon of June 17, 1906.

The declaration contains two counts in each of which the injury, for which damages are claimed, is alleged to have been that "the plaintiff's dwelling houses were flooded and ruined, the household furniture therein greatly damaged, fences washed away, fruit trees, orchard products and growing crops destroyed, wells and cisterns filled with mud and debris, meadow lands along said stream made miry and untillable, buildings washed away and destroyed and other damages to the plaintiff then and there," etc.

The nuisance, to the existence of which the alleged injuries are attributed, is differently described in the two counts of the declaration. The first count alleges that the "culvert is entirely too small for the free passage of the waters of said stream and the surface waters flowing in said ravine so that the said stream and ravine now become dammed and chocked up and the waters thereof are ponded back upon the plaintiff's land to the great nuisance of the plaintiff." The second count alleges that the railroad company "negligently constructed and improperly placed a culvert under its said track for the passage of the waters of said stream and that in times of freshets, such as are wont to occur in said ravine, the said culvert is entirely too small for the free passage of the waters of said stream and the surface waters flowing in said ravine and fence rails, brush, loose timber and such

other debris as said stream and such surface water usually carry with them, so that the said stream and ravine now becomes dammed and choked up and the waters thereof are ponded back upon the plaintiff's land to the great nuisance of the plaintiff," etc.

The railroad company, as defendant below, pleaded the general issue, and, after the removal of the case to the Circuit Court for Frederick County, its trial before a jury resulted in a judgment for the plaintiff of $3,254.00.

The record contains thirteen bills of exceptions of which eleven relate to rulings on evidence and two to the Court's action on the prayers.

There is evidence in the record tending to show that the Western Maryland Railroad Company's line crossed a creek, in Washington County, known as Camp Spring creek at a point a short distance south of and below the appellee's farm. Prior to the year 1906 the railroad tracks crossed this creek and the depression or valley, through which it runs, on a trestle about 175 feet long at the bottom and about 43 feet high where it crossed the creek. In the spring of 1906 this trestle was replaced by a solid fill or embankment under which a culvert was constructed at the crossing of the creek. The normal current of water in the creek through the appellee's farm was only about six feet wide and six inches deep, but, as the valley ran along the base of a mountain, it was liable to rapidly increase in volume in times of sudden rains or freshets. The culvert was nine feet wide at its base, ten feet wide at the springing of the arch and eleven feet high, giving an opening of ninety-six square feet to receive the water.

There is technical testimony of engineers in the record tending to show that considering the topography of the vicinity the dimensions of the culvert are larger than necessary to provide for the water shed drained by the creek for the passage of which it was built, and other testimony tending to show that even if its capacity be adequate to permit the passage of all of the waters of the stream and ravine its location

and shape are such as to cause the flooding of the appellee's farm and buildings before its full capacity can be utilized. The record also contains much evidence both *pro* and *con* upon the question whether the freshet of June 17, 1906, during which the appellee's land and buildings were injured, was such as by the exercise of ordinary care and prudence might have been anticipated or was an unusual and extraordinary one. We refrain from further reference to the testimony upon these controverted issues as they are plainly questions of fact for the jury, as is also the question as to which the testimony is conflicting whether the railroad company had been negligent in closing up the embankment before the sheet piling used in constructing the culvert had been removed from its interior.

The testimony as to the nature and extent of the injury done by the freshet of June 17, 1906—much of which was admitted over objections to be hereafter noticed—tends to show that, upon that occasion, the north end of the culvert, into which the water flows, became jammed with debris of various kinds, including brush, rails, hay, the fragments of a bridge which had been washed away from higher up the stream, portions of the roof of a building all of which had come down on the swollen stream. A piece of timber became wedged across the mouth of the culvert and held this jammed debris in position for several hours causing the water to back up upon and over portions of the appellee's farm until it rose to a depth of five or six feet in the two dwellings erected thereon, one of which was occupied by him and the other by his tenant and damaged the carpets and furniture in the rooms which it entered. The water thus ponded back submerged about one half of the fourteen acres of meadow land belonging to the farm and about three acres of its upper fields, destroying the corn and grass crops growing thereon. The houses stood near the bed of the creek at an elevation of four or five feet above its ordinary level. The house occupied by the appellee was 800 feet from the culvert.

A large spring known as Big Spring lying between the plaintiff's farm and the railroad embankment was also flooded, and a deposit of mud several feet deep was left in the spring, when the flood water receded from it. This deposit almost entirely stopped the flow of water into the spring from its usual sources of supply. When the mud was drained off from the spring the normal flow of water into it gradually returned. It was testified by different witnesses, subject to exception, that, several weeks after the freshet of June 17, 1906, but before the flow of water into the Big Spring had been fully restored, wet places and springs of water appeared all over the meadow land of the appellee, only one-half of which had been flooded by the freshet. About ten acres of the meadow was thus turned into a marsh and rendered untillable and it had not fully dried out at the time of the trial. This meadow land is about 700 or 800 feet distant from the Big Spring and upon a higher grade. There is also testimony, taken subject to exception, tending to show that the water which thus appeared in the meadow was of the same temperature as that of Big Spring and similar to it in appearance, and that as the flow of water in the spring increased the flow in the meadows decreased, and that if a pool of water which appeared near the appellee's barn when the springs appeared in the meadow, was made muddy the water in the Big Spring became cloudy.

There is also testimony tending to show that upon the occurrence of another heavy rain on August 27, 1906, the water in the creek again backed up until it was almost on a level with the first floor of the appellee's house, and that it had never done so before the erection of the railroad embankment.

At the close of the testimony in the trial below the plaintiff offered three prayers and the defendant offered sixteen. The Court granted all of the plaintiff's prayers and the eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth and sixteenth of the defendant's and rejected its other prayers.

The plaintiff's first prayer in substance instructed the jury that if they found that, prior to the construction of the embankment and culvert, the waters of the creek, including storm and ·freshet waters, were accustomed to run unobstructed in their flow, and that the culvert is of insufficient capacity to carry off the water, which the defendant by the exercise of ordinary care and prudence might reasonably have anticipated and expected to be in the creek and the depression through which it ran; and further found that by reason thereof in the summer of 1906 the said waters were ponded back and overflowed the plaintiff's property and that he was injured thereby, and that but for the embankment and the insufficient capacity of the culvert the injuries would not have occurred, then the plaintiff was entitled to recover.

The second prayer was similar to the first, except that it predicated the plaintiff's right to recover upon the finding by the jury that the injury to the plaintiff's property by the ponding back of the water was the result not only of the insufficient capacity of the culvert, but also of its improper location.

The plaintiff's third prayer, which defined the measure of damages, was as follows:

"If the jury find for the plaintiff, then in estimating the damages to be given by their verdict they may take into consideration any loss and injury they may find from the evidence the plaintiff has sustained by reason of the ponding back of the water over the plaintiff's property which the plaintiff sustained from the time of such ponding back until the time of the trial of this case, and allow the plaintiff such sum as they believe from the evidence will compensate him for the damage and injury they may believe he has suffered from such cause, including compensation for injury to his land (if they find there was any injury) naturally and necessarily from such ponding."

The defendant, in addition to its general exception to the granting of the plaintiff's prayers, specially excepted to the granting of the first and second prayers for want of legally

sufficient evidence of the insufficiency or improper location of the culvert or that the plaintiff suffered any injury except from the overflow of June 17th, 1906.

The general principle of a defendant's liability in cases like this upon which the plaintiff's first and second prayers were founded is correct, as it is in accord with the rulings of this Court in the cases of *P., W. and B. Ry Co.* v. *Davis,* 68 Md. 281; *Pied. and Cumb. Ry.* v. *McKenzie,* 75 Md. 458; *Sentman* v. *B. and O. R. R. Co.,* 78 Md. 222; *Balto. and Sparrows Pt. R. R. Co.* v. *Hackett,* 87 Md. 224; *New York, etc., R. R. Co.* v. *Jones,* 94 Md. 24.

The plaintiff's prayers, however, were all defective in not confining his right to recover, in respect to the alleged injury to the land and the houses thereon, to the damage to his reversionary interest therein. The declaration distinctly averred that he was only the owner of the "reversion" in the farm which was alleged to have been "in the possession of John Luther Rhodes as tenant thereof" at the time of the injury complained of. The undisputed evidence shows that at the time of the trial the tenant was still in possession of it, although the plaintiff resided in the smaller of the two houses, but under what arrangement he did so was not disclosed by the testimony. If the third prayer had properly directed the jury as to the precise elements of damage for which the plaintiff was entitled to recover in case they found in his favor, we would not have regarded the granting of the first and second prayers as reversible error, because we cannot say that there was no legally sufficient evidence of injury to the plaintiff's reversionary interest in the farm by the flood of June 17th, 1906.

The plaintiff's third prayer, upon the measure of damages, was so general and indefinite that there was reversible error in granting it.

This Court has repeatedly held that, while the simple question whether damages have been sustained by the breach of duty or the violation of right and the extent of damages sustained as the direct consequences thereof are matters within

the province of the jury, "the Court must decide and instruct
the jury in respect to what elements and within what limits
damages may be estimated in the particular action." *B. and
O. R. R.* v. *Carr,* 71 Md. 143; *Belt R. R. Co.* v. *Sattler,* 102
Md. 605; *W. U. Tel. Co.* v. *Lehman,* 105 Md. 450.

In *B. and O. R. R. Co.* v. *Carr,* the suit was by the holder
of a railway ticket for the refusal of a gate keeper at a sta-
tion to permit him to pass to a train on which he desired to
take passage. The Court instructed the jury that if they
found for the plaintiff for the refusal to pass him through the
gate, he was entitled to such damages as they might find
would under all the circumstances compensate him for such
refusal. In holding this instruction to be bad, the Court,
speaking through the late CHIEF JUDGE ALVEY, said: "This
left the whole question of damages at large, without definition
by the Court, to the discretion of the jury, and without any
criterion to guide them. * * * This is not justified by
well-established rules of law. In *Knight* v. *Egerton,* 7 Exch.
407, where in effect such an instruction was given, the Court
of Exchequer held it to be wholly insufficient, 'and that it
was the duty of the judge to inform the jury what was the
true measure of damages on the issue, whether the point was
taken or not,' and the Court directed a new trial because of
the indefinite instruction as to the true measure of damages.
* * * Indeed, it is of the utmost importance that juries
should be explicitly instructed as to the rules by which they
are to be governed in estimating damages; for, as was justly
observed in *Hadley* v. *Baxendale,* 'if the jury are left with-
out definite rules to guide them, it will in most cases lead to
the greatest injustice.' "

In *Belt R. R. Co.* v. *Sattler, supra,* the plaintiff sued for
damages sustained by him for injuries from smoke, noise and
vibration caused by defendant's passing trains and from cin-
ders, noxious vapors and gases thrown by its locomotives upon
his residence and premises, of which he owned a portion and
his wife owned the residue. The Court instructed the jury
that if they found for the plaintiff they might "allow him

such damages as they may find from the evidence to have been directly caused to his interest in the premises by reason of the said smoke, gas, vapors, noise and vibration from the time said effect was first produced down to the institution of this suit." That prayer was held to be too general and indefinite because "it failed to direct the jury as to the precise elements or items of damage for which the plaintiff was entitled to recover, in case the jury should find the facts recited in the prayer." In that case, as in the present, the plaintiff had offered evidence of a variety of facts tending to show an interference with the use and enjoyment of the property and the fruits and products grown thereon, but had offered no evidence of actual loss by diminution in the market value of the property.

In the case before us the record contains evidence tending to show injury to the plaintiff's household furniture for which the measure of damages for so much thereof, if any, as was entirely destroyed would be its value at the time of destruction, and for so much thereof as was merely damaged would be the cost of repairing it. There is also evidence of injury to the land and the two houses, the measure of damage for which in so far, if at all, as it was permanent, would be the depreciation, if any, in value of the plaintiff's reversionary interest therein caused by the construction of the embankment, and in so far as it affected the mere use and occupation of the farm and did not extend beyond the tenant's term the plaintiff, as owner of the reversion, would be entitled to no damage at all in the absence of proof of a provision in his lease requiring him to make good to his tenant injuries of that character. For the injury shown to have been done to the crops on the submerged land the tenant, if anyone, and not the plaintiff, would be entitled to recover damages, in the absence of proof that, under the lease of the land rent was to be paid by a share of the crops. Under these circumstances the prayer in question, throwing open as it did to the jury all of the various elements of damage to which we have referred, upon which to speculate without restraint in arriving at the

amount of their verdict, was manifestly too general and indefinite.

What we have already said renders it unnecessary for us to notice in detail all of the eight rejected prayers of the appellant. The first two of them instruct the jury to find for the defendant for want of any legally sufficient evidence to entitle the plaintiff to recover. The next five of them hold that there was no legally evidence to support some one or more of the several facts of which we have said that there was evidence. There was no error in rejecting those seven prayers.

The defendant's fifteenth prayer prohibits the jury, in the event of their finding for the plaintiff, from taking into consideration in estimating damages any injury from the appearance of springs or water after the freshet of June 17th, 1906, in that part of the plaintiff's land that was not actually submerged by the flooded stream. This prayer deals with the element of subterranean waters. The authorities agree that there is no difference in principle between the rights incident to streams of water upon the surface of the ground and those flowing underneath it when the latter move in known and well-defined channels. The difficulty in reference to underground streams arises from the absence of definite and reliable evidence as to their existence, location and course. *Collins* v. *Chartier's Valley Co.,* 131 Pa. 143; *Harwood* v. *Benton,* 32 Vt. 736.

The authorities generally agree that the presence under land of mere percolating water, not flowing in known and well-defined channels, does not ordinarily affect the owners of the land with the same rights and duties as those incident to definite streams. 30 *A. and E. Encycl.* 210-212; *Wheelock* v. *Jacobs,* 70 Vt. 162; *Huber* v. *Merkell,* 117 Wis. 355; *Tampa Water Works* v. *Cline,* 37 Fla. 586; *Washington Co. Water Co.* v. *Garver,* 91 Md. 398; *South. Pacf. R. R. Co.* v. *Dufour,* 19 L. R. A. 92 and notes.

The decided weight of English and early American authorities supported the doctrine that percolating water was as much part of the land in which it existed as the soil, stones

and minerals therein and was the absolute property of the owner of the land, who might use or deal with it as he pleased without reference to the effect of his action upon adjacent or other lands. *Acton* v. *Blundell,* 12 Mees. and W. 324; *Chasemore* v. *Richards,* 7 H. L. Cases, 349; *Goodale* v. *Tuttle,* 29 N. Y. 459; *Ocean Grove* v. *Asbury Park,* 40 N. J. Eq. 447; *Huber* v. *Merkell, supra; Southn. Pac. R. R.* v. *Dufour,* 95 Cal. 615; *Stillwater Co.* v. *Farmer,* 89 Minn. 58. The recent American cases show a decided tendency to recede from the earlier view which accorded to the owner of land the unrestrained right of use and disposition of the percolating water contained in it, and to so far modify that doctrine as may be requisite to do substantial justice between the owners of adjacent lands whose peculiarities of location, climate, soil or products are such as to render the application of the earlier rule inequitable. The cases exhibiting the origin and growth of this tendency are collected in 64 *L. R. A.* 236 in an instructive footnote to the case of *Katz* v. *Walkinshaw,* and in the notes to *Erickson* v. *Crookstown Waterworks Co.,* 10. A. & E. Annotated Cases, 843.

Admitting that the correlative rights of adjacent landowners to the use of percolating waters should be exercised in subordination to the maxim *sic utere tuo,* etc., the fact remains, as stated in *Chatfield* v. *Wilson,* 28 Vt. 49, that "the secret, changeable and uncontrollable character of underground water in its operation is so diverse and uncertain that we cannot well subject it to the regulations of law nor build upon it a system of rules as is done in the case of surface streams." We think that in order to hold a defendant in a case like the one now before us liable for an alleged diversion of underground water the fact that such water before its diversion was accustomed to flow, if not in a fixed channel, at least in a uniform direction, should be made plainly to appear. In view of the nature of subterranean water the cases hold with great uniformity that where it does not appear from the evidence that a spring is supplied by any well-defined flowing stream it will be presumed that it is formed by the ordinary

percolation of the water in the soil.   30 *A. and E. Encycl.*
311; *Gould on Watercourses,* sec. 281; *Pence v. Carney,* 58
W. Va. 296; *Ocean Grove v. Asbury Park,* 40 N. J. Eq. 447;
*Barclay v. Abraham,* 64 L. R. A. 225; *Harwood v. Benton,
supra; Hanson v. McCue,* 42 Cal. 303; *Tampa Waterworks
v. Cline, supra.*

Applying by analogy these principles to the case before us,
we are of opinion that the plaintiff failed to produce any evi-
dence legally sufficient to show that the big spring was sup-
plied by underground water flowing either in a fixed channel
or a uniform direction.   There was some evidence tending to
prove a similarity in the temperature and appearance of the
water which appeared in the meadow and that in the spring,
and tending perhaps to prove a common source of the water
in the two places or possibly some indirect underground com-
munication between them.   In view, however, of the great
uncertainty as to the laws and causes of the movement of un-
derground waters and the fact that the water did not appear
in the meadow until two or three weeks after the flow into
the spring was stopped by the mud, and that when the water
did appear in the meadow it came up in spots over an area
of more than ten acres, instead of forcing its way to the sur-
face in one place, as a stream might be expected to do, the
evidence was too indefinite and uncertain to justify a reason-
able mind in reaching the conclusion that the appearance of
the water in the unflooded portion of the meadow was the
result of the stoppage of the spring.   The defendant's fif-
teenth prayer should therefore have been granted.

Turning now to the exceptions to the admission of evi-
dence.   There was error in admitting in evidence the small
photograph, referred to in the first exception, of the railroad
crossing as it existed before the erection of the embankment.
It was offered in evidence by the plaintiff, who testified that
he had gotten it from a neighbor, and did not know by whom
or from what position or how many years ago it had been
taken, but was only able to say that it represented the condi-
tions before the fill according to his way of looking at them.

The evidence was unimportant and its admission would not of itself have constituted reversible error.

Without reviewing in detail the rulings brought up by the second, third, fourth, fifth and sixth exceptions which concern testimony touching the appearance of the water in the meadowland of the plainitff some time after the freshet of June, 1906, we content ourselves with saying that the testimony, in so far as it related to the portion of the land which was not submerged by the flooded waters of the freshet, should have been excluded. We find no error in the rulings presented by the other exceptions.

The judgment appealed from must be reversed and the case remanded for a new trial.

> *Judgment reversed and case remanded for a new trial.*