701 A.2d 397

**Elwood KIRBY et ux.**

v.

**Karen HOOK et vir.**

**No. 89, Sept. Term, 1996.**

Court of Appeals of Maryland.

Oct. 15, 1997.

Gorman E. Getty, III, Cumberland, for petitioner.

No brief filed on behalf of respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI,* RAKER and WILNER, JJ.

CHASANOW, Judge.

In this case, we are called upon to decide whether the Court of Special Appeals erred in affirming the Circuit Court for Allegany County's decision to grant an injunction prohibiting Petitioners from interfering with or obstructing Respondents' use of water from a spring located on Petitioners' land. We shall affirm the judgment of the Court of Special Appeals.

## I.

This case concerns an easement to take water from a spring. The spring is located on a parcel of land in Allegany County that was once part of a 3.42 acre parcel owned by Thomas and Mary Machin. On January 31, 1930, the Machins conveyed 1.61 acres of their 3.42 acre parcel to John and Bessie Orndorff. For clarity's sake, we shall refer to the 1.61 acre parcel that was conveyed to the Orndorffs as the spring parcel. The spring parcel contains the spring that is the subject of this suit. The Machin–Orndorff deed expressly reserved an easement for the Machins and their "heirs and assigns" to use water from the spring as follows:

"IT IS EXPRESSLY UNDERSTOOD that the [Machins] hereby reserve unto themselves, their heirs and assigns, the

---

* Karwacki, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, § 3A, he also participated in the decision and the adoption of this opinion.

right to use jointly with the [Orndorffs], their heirs and assigns, the use of the spring on the above described land, with the right of ingress, egress and regress for the purpose of laying a pipe line from said spring and keeping it in order."

On May 17, 1946, the Machins sold the remaining 1.81 acres to Harry and Lavina Simpson. The Machin–Simpson deed conveyed the parcel

"TOGETHER with the buildings and improvements thereon, and the rights, roads, ways, waters, privileges and appurtenances thereunto belonging, or in anywise appertaining, including the right to the use of the water from the spring on the adjoining property which is now owned by John Orndorff as provided in the reservations made in the deed to the said John Orndorff. . . ."

On August 15, 1952, this 1.81 acre parcel was divided into two parcels, a 1.31 acre parcel that remained with the Simpsons, which we shall refer to as Parcel A, and a one-half acre parcel that was conveyed to Gerald and Elsie Barb, which we shall call Parcel B. The Barbs' deed conveyed Parcel B to the Barbs:

"Together with the buildings and improvements thereon, and the rights, roads, ways, waters, privileges and appurtenances thereunto appertaining or in anywise belonging, including the right to the use of the water in the spring on the adjoining property which is now owned by John Orndorff et ux as provided in the reservations made in the deed to the said John Orndorff et ux from Thomas Machin et ux dated January 31, 1930 . . . ."

Parcel B does not physically adjoin the spring parcel, but is separated from the spring parcel by Parcel A.

The spring parcel was sold to Elwood and Emma Kirby, the petitioners in this action, on March 22, 1955.[1] Sometime after

---

1. The Kirbys' deed described the property as

"the same property which was conveyed unto the parties of the first part by deed of Thomas Machin and Mary E. Machin, his wife, dated

this conveyance, the Barbs as owners of Parcel B, asked Petitioners for and received permission to install an underground water line that ran from the spring across Parcel A to Parcel B. The exact date that the water line was installed is uncertain, but it occurred after Petitioners purchased the spring parcel, in 1955, and before the Barbs sold Parcel B, in 1973.

Parcel B was sold to Karen and Stanley Hook, the respondents in this action, on January 19, 1973. The property was conveyed

> "[t]ogether with the buildings and improvements thereon, and the rights, roads, ways, waters, privileges and appurtenances thereunto belonging or in anywise appertaining...."

Respondents used the spring until the summer of 1992, when Petitioners capped the pipeline[2] on their property, thus cutting off Respondents' use of the water.[3]

Respondents filed suit[4] in the Circuit Court for Allegany County, claiming the right to use water from the spring under several legal theories. First, Respondents claimed that an easement to take water from the spring had been expressly granted by a deed in the chain of title. Second, they argued that their status as riparian landowners gave them a valid interest in the spring. Finally, Respondents claimed that they had a right to use water piped from the spring via an easement by prescription. The trial court agreed with Respondents' arguments as to all three theories and granted an

---

the 31st day of January, 1930, which is recorded among the Land Records of Allegany County, Maryland...."

**2.** Kirby later removed the pipeline from the ground.

**3.** After the water supply from the spring was cut off, Respondents used water from a well on their property in place of the water from the spring. It is not clear when this well was installed on the property.

**4.** At trial, Respondents were represented by counsel. On appeal in this Court, as well as in the Court of Special Appeals, Respondents are pro se and did not file a brief.

injunction prohibiting Petitioners from interfering with or obstructing Respondents' use of water from the spring.

On appeal, the Court of Special Appeals affirmed the decision of the trial court in an unreported, per curiam opinion primarily based on two grounds. The intermediate appellate court first assumed that the case turned upon the doctrine of riparian rights and affirmed on that basis. The intermediate appellate court also stated, however, that even if the riparian rights doctrine did not apply, the trial court's decision would still be affirmed because Respondents automatically received an appurtenant easement to use the spring because such easements run with the land. This Court granted a writ of certiorari to consider the following issues:

1. Did the trial court and the intermediate appellate court err in finding that a grant of riparian rights to a nonriparian property was valid?

2. Did the Respondents fail, as a matter of law, to establish a prescriptive right to take water from the spring?

3. Did the trial court err when it concluded that a grant of permission to take water from a spring was void as an attempt to convey an interest in real property, in violation of the statute of frauds?

4. Was the intermediate appellate court wrong to determine that the Respondents' right to use Petitioners' spring "may be more in the nature of a real property right"?

5. Was the intermediate appellate court's determination that an easement, not mentioned in a deed to a noncontiguous property, is nonetheless "appurtenant," legally wrong?

## II.

We can dispense with the first issue raised in the petition for certiorari immediately. This case does not involve riparian rights because no permanent watercourse or stream

emanates from the spring at issue. Thus, the doctrine of riparian rights does not apply.

Both the trial court and the Court of Special Appeals concluded that, although Respondents were not owners of riparian land, they were nevertheless entitled to use water piped from Petitioners' spring under the law of riparian rights. Both courts relied heavily on the case of *Kelly v. Nagle,* 150 Md. 125, 132 A. 587 (1926). In *Kelly,* Thomas Nagle and his wife obtained from Alverda Hood and her husband approximately fifty-six acres of land located on the south side of a public road on March 1, 1900. 150 Md. at 127, 132 A. at 588. Fifteen years later, Thomas Nagle conveyed to James Kelly a large portion of the land, but kept approximately six acres which contained their home and a large spring forming the source of a stream. *Id.* The spring was located between the Nagles' home and a public road. 150 Md. at 127, 132 A. at 588–89. The water from the spring flowed over this six-acre parcel. 150 Md. at 139, 132 A. at 593. On April 19, 1921, Thomas Nagle obtained from Spencer Nagle six and one-half acres of land located on the north side of the public road separated by the road from the property which contained the spring. 150 Md. at 127, 132 A. at 588. On February 14, 1922, Thomas Nagle and his wife conveyed this six and one-half acre tract to their daughter-in-law, Jennie Nagle:

> "Together with the buildings and improvements thereupon and all and every the rights, roads, ways, waters, easements and appurtenances thereto belonging or in any wise appertaining."

150 Md. at 127–28, 132 A. at 589. Shortly thereafter, on November 16, 1922, Thomas Nagle executed another deed to Jennie Nagle which granted her "the right and privilege of laying a water pipe, not exceeding three-quarters of an inch in diameter" directly from the spring located on Thomas Nagle's land across to Jennie Nagle's land so that she "may enjoy the use of such water from said spring as she may need on her ... property." 150 Md. at 128, 132 A. at 589. Jennie Nagle subsequently laid a three-quarter inch pipe from the spring to her property. After Thomas Nagle died, Kelly acquired the

Nagles' approximately six acre tract of land containing the spring in May 1924 and, as a result, owned the entire fifty-six acre parcel that Thomas Nagle had purchased from Hood. 150 Md. at 129, 132 A. at 589. In February 1925, Kelly plugged up the pipe which ran from the spring to Jennie Nagle's property. 150 Md. at 129, 132 A. at 589.

Jennie Nagle later filed suit against Kelly claiming that she had a right to use the water from the spring by virtue of the deed expressly conveying to her the right to lay and maintain the pipe from the spring to her property. 150 Md. at 129–30, 132 A. at 589. Kelly argued that Thomas Nagle did not have the right "to dispose of the water directly from the spring . . . because it was an invasion and in derogation of [Kelly's] riparian rights." 150 Md. at 136, 132 A. at 592. This Court concluded that Kelly's rights as a lower riparian owner "enti-tle[d] him to have the water of a stream flow down to his land as it is wont to flow, in its natural course and manner, unimpaired in quality and undiminished in quantity, with the limitation that every other riparian owner above is entitled to the reasonable use of the water." 150 Md. at 137–38, 132 A. at 592. However, this Court concluded that the reasonable-ness test did not apply since the case involved a dispute between a riparian owner, Kelly, and a non-riparian owner, Jennie Nagle. 150 Md. at 139, 132 A. at 593. Although Jennie Nagle's land bordered on the stream which flowed from the spring and thus Jennie Nagle was a riparian owner as to the stream, this Court concluded that she was not a riparian owner as to the flow of the water from the spring over Kelly's land. She, therefore, could not divert water directly from the spring by a pipe "at a point farther up the stream than [Kelly's] land," thereby depriving Kelly of his riparian rights. 150 Md. at 139, 132 A. at 593.

This Court held that a landowner whose property contains a spring forming the source of a stream has no authority to divert water directly from the spring to other non-riparian lands and, therefore, cannot grant such a right to another. 150 Md. at 140, 132 A. at 593. We opined that

"the diversion of water by a permanent pipe line from the [approximately] six acre ... tract to the six and one-half acre tract across the public road, which would result in lessening the natural flow over [Kelly's] land, would constitute an unrea[s]onable use of the riparian right attached to the [approximately] six acre ... tract, and could be restrained by [Kelly]."

*Id.* Therefore, Thomas Nagle's grant to Jennie Nagle permitting her to use water directly from the spring was invalid. 150 Md. at 140–41, 132 A. at 593.

In the instant case, the Court of Special Appeals affirmed the trial court's determination that *Kelly* did not "prevent [Respondents] from receiving a valid interest in the spring." Specifically, the intermediate appellate court distinguished *Kelly* from the instant case, noting that Jennie Nagle's land in *Kelly* never had riparian rights because it was always separate from the land which contained the spring. The intermediate appellate court concluded that Respondents' property (Parcel B) was once part of a single piece of riparian land located adjacent to Petitioners' property (the spring parcel) before Parcel B was separated from the Simpsons' 1.81 acre parcel. Although the court noted that Respondents' property lost its riparian status when the Simpsons subdivided their 1.81 acre parcel into Parcel A and Parcel B, the court reasoned that the Simpsons were entitled to include riparian rights in their conveyance of Parcel B to the Barbs because Parcel B originally enjoyed such rights when it was part of Parcel A.

■ We disagree with the Court of Special Appeals' reliance on *Kelly* as the initial ground for its judgment because neither Petitioners, nor Respondents, have riparian rights in the spring. Generally, a riparian landowner is "defined as one who owns land bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a body of water, such as a river, bay, or running stream." *People's Counsel v. Maryland Marine,* 316 Md. 491, 493 n. 1, 560 A.2d 32, 33 n. 1 (1989) (citation omitted). Respondents' land, however, is not bordering upon, bounded by, fronting

upon, abutting or adjacent and contiguous to any such body of water.

In fact, the Court of Special Appeals recognized that the right to use Petitioners' spring "may be more in the nature of a real property right." The intermediate appellate court stated that an owner of land that contains a spring has riparian rights in the spring where the spring water is the "source of 'a permanent stream or watercourse' that runs across adjacent or nearby land." (quoting 78 Am.Jur.2d, *Waters* § 177, at 624 (1975)); *see also* J.P.M., Annotation, *Subterranean and Percolating Waters; Springs; Wells,* 55 A.L.R. 1385, 1502 (1928). In discussing an alternative ground for its judgment, the Court of Special Appeals, quoting 78 Am.Jur.2d, *Waters* § 177, at 624–25, explained:

"[T]he doctrine of riparian rights does not apply when land contains a spring that is not the source of a defined and constant channel. We find the following commentary instructive:

'Where the water flowing from a spring establishes a permanent stream or watercourse upon or across adjoining land, riparian rights attach thereto in favor of the owners of such land, and the owner of the land upon which the spring arises likewise has only the rights of a riparian owner in the waters of the spring. . . . *But where the waters of a spring do not form a watercourse which leaves the lands upon which the spring arises, but sink back into the earth at the spring, spread over the surrounding land, or flow in a course entirely upon the lands upon which they arise, disappearing before reaching adjoining land, the spring is ordinarily regarded as the exclusive property of the owner of the land on which it is situated, who has all the rights incident thereto that one might have as to any other species of property.* The owner of land on which a new spring breaks out may make such use of the water as he pleases where the flow has not established a watercourse on or over adjoining lands, even though it would eventually do so if unmolested.' " (Citation omitted)(emphasis added).

Unlike in *Kelly,* there is no evidence that any permanent watercourse or stream flows upon or across the adjoining land from the spring at issue. Although Ms. Hook testified that the spring sometimes overflowed downhill from Parcel A onto Parcel B, she later admitted that what she believed to be "overflow" from Parcel A actually emanated from a point on her property approximately ten feet from the spring's pipeline. In fact, Mr. Kirby testified at trial that the spring water had never overflowed from the walls of the spring house onto the spring parcel. Thus, *Kelly v. Nagle* does not resolve the instant case.

■■■ The waters at issue in this case are more accurately termed "percolating waters." Percolating waters " 'ooze, seep or filter through soil beneath the surface, without a defined channel, or in a course that is unknown and not discoverable from surface indications without excavation for that purpose.' " *Finley v. Teeter Stone, Inc.,* 251 Md. 428, 432, 248 A.2d 106, 109 (1968)(quoting *Clinchfield Coal Corporation v. Compton,* 148 Va. 437, 139 S.E. 308, 311 (1927)). In Maryland, it is presumed that water from a spring is formed by percolating waters. *Finley,* 251 Md. at 432, 248 A.2d at 110 ("Unless it can be shown that the 'underground water flows in a defined and known channel it will be presumed to be percolating water.' " (Citation omitted)); *Western Md. R. Co. v. Martin,* 110 Md. 554, 566–67, 73 A. 267, 272 (1909)("[W]here it does not appear from the evidence that a spring is supplied by any well-defined flowing stream it will be presumed that it is formed by the ordinary percolation of the water in the soil."). In the present case, we have been unable to find any evidence in the record to rebut the presumption that the spring at issue is formed by percolating waters.

■■■ Percolating waters are not governed by the law of riparian rights, but by a separate and distinct body of law. *See Finley,* 251 Md. at 432–33, 248 A.2d at 110. Because no permanent watercourse or stream flows from the spring at issue, Respondents do not have riparian rights in the spring.

III.

Combining the second and third issues raised by Petitioners, we agree with the Court of Special Appeals that Respondents' right to use water piped from Petitioners' spring is "more in the nature of a real property right" and affirm the judgment of the Court of Special Appeals, but on somewhat different grounds.

An easement is "a nonpossessory interest in the real property of another." *Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630, 635 (1984)(citing *Condry v. Laurie*, 184 Md. 317, 320, 41 A.2d 66, 68 (1945)). An easement can be created expressly or by implication. *Boucher*, 301 Md. at 688, 484 A.2d at 635. One form of implied easement is an easement by prescription. *Id.* (citing *Dept. of Natural Res. v. Ocean City*, 274 Md. 1, 7–9, 332 A.2d 630, 634 (1975)). A prescriptive easement arises when a party makes an adverse, exclusive, and uninterrupted use of another's real property for twenty years. *Condry*, 184 Md. at 321, 41 A.2d at 68; *Cox v. Forrest*, 60 Md. 74, 79 (1883). A party's use is adverse if it occurs without license or permission. *Condry*, 184 Md. at 321, 41 A.2d at 68; *see Zimmerman v. Summers*, 24 Md.App. 100, 112, 330 A.2d 722, 728–29 (1975)(noting that asking permission implies recognition of the owner's right to prevent the use which is inconsistent with adversity). When a person has used a right of way openly, continuously, and without explanation for twenty years, it is presumed that the use has been adverse under a claim of right. *Condry*, 184 Md. at 321, 41 A.2d at 68. The burden then shifts to the landowner to show that the use was permissive. *See Cox*, 60 Md. at 80.

A.

The trial court concluded that Respondents acquired an easement to use water from Petitioners' spring by prescription. In a written opinion, the trial court found:

"In the present case, Kirby testified at trial that he granted permission to construct an underground pipeline stretching

from the spring to the Barbs' house, across someone else's property, because the Barbs' property had no other source of water. Considering the major undertaking involved and the permanent nature of the Barbs' problem, from these factors Kirby intended to grant a permanent right.

Since the oral grant of a permanent right in land is ineffective, no permission existed and any use by the Barbs' and the Hooks' is adverse." (Citation omitted).

For the following reasons, we conclude that Respondents' use of the spring was adverse, even though the Barbs asked for and Mr. Kirby granted them permission to install a pipeline to take water from the spring.

■■■■■■ As a general rule, permissive use can never ripen into a prescriptive easement. *Phillips v. Phillips*, 215 Md. 28, 33, 135 A.2d 849, 851 (1957). There is an exception to that general rule where there has been an attempt to grant an irrevocable easement which is void because of the statute of frauds. *Id.* The statute of frauds requires any assignment, grant, or surrender of an interest in land to be in writing. Maryland Code (1974, 1996 Repl.Vol.), Real Property Article, § 5–103. An oral grant of an easement, for example, is unenforceable due to the statute of frauds. *Phillips*, 215 Md. at 33, 135 A.2d at 851. Such "oral permission, believed to be irrevocable but unenforceable by reason of the Statute of Frauds, may evidence a claim of right and indicate that user was adverse and not permissive." *Lichtenberg v. Sachs*, 200 Md. 145, 154, 88 A.2d 450, 454 (1952). Because Mr. Kirby's permission was never reduced to writing, the trial court correctly concluded that his attempt to grant an oral easement beyond a license was ineffective.

■■■■■ Whether an oral grant is intended to convey an irrevocable right or merely a license is a question of fact. *Phillips*, 215 Md. at 33, 135 A.2d at 851. The trial court found that in granting permission Mr. Kirby intended to create a permanent right, not a mere license, considering Mr. Kirby's testimony that the Barbs had no other source of water and the major undertaking involved in constructing an underground

pipeline. Such a factual finding will not be disturbed unless clearly erroneous. *Cf. id.* The trial court's factual finding that Mr. Kirby intended to create a permanent right in the Barbs was not clearly erroneous. It is reasonable to conclude that Mr. Kirby intended to grant to the Barbs the same easement that was contained in some of the prior deeds in the chain of title. In the original deed from the Machins to the Orndorffs, that easement purported to be permanent, passing to the "heirs and assigns" of both parties. In addition, other reasons given by the trial judge for finding Mr. Kirby intended to create a permanent easement were not clearly erroneous.

## B.

■■■ Regarding whether Respondents could tack their use of the spring to the Barbs' use in order to meet the statutory period of twenty years, the trial court also found:

> "All that is required to tack a prior possessor's time of use to the present possessor's time is 'color of title.' Under the deeds given from Simpson to Barb to Hook, the requisite belief of ownership by both the Barbs and the Hooks allow the Hooks to tack their prescriptive use to exceed the 20 years required." (Citation omitted).

As stated earlier in this opinion, Respondents acquired title to the land in 1973. They had been using the spring for only nineteen-and-one-half-years when Petitioner capped the pipe in 1992. Thus, Respondents on their own have not met the requisite twenty-year period. *Cf. Dalton v. Real Estate & Imp'v't Co.*, 201 Md. 34, 92 A.2d 585 (1952)(owner set up railroad ties to prevent use of road after it had been used for seventeen years, preventing party from meeting the prescriptive period).

This Court has questioned whether a party's use of a pipeline for water may be tacked to a predecessor's use where the deed does not convey the right to take water from such pipeline. *See Hansel v. Collins*, 180 Md. 209, 217, 23 A.2d 686, 690 (1942)(citing *Fleischmann v. Hearn*, 141 Md. 463, 118 A.

847 (1922)). Since *Hansel*, however, we have consistently held that "possessions under color of title of the successive predecessors in title may be tacked to complete the twenty year statutory period." *Clayton v. Jensen*, 240 Md. 337, 344, 214 A.2d 154, 159 (1965); *see also Freed v. Cloverlea Assn.*, 246 Md. 288, 228 A.2d 421 (1967)(discussing tacking in the context of an adverse possession case). The deed from the Barbs to Respondents grants Parcel B "[t]ogether with the buildings and improvements thereon, and the rights, roads, ways, waters, privileges and appurtenances thereunto belonging or in anywise appertaining...." The trial court found that "[u]nder the deeds given from Simpson to Barb to Hook, the requisite belief of ownership by both the Barbs and the Hooks allow[s] the Hooks to tack their prescriptive use to exceed the 20 years required." We agree. In addition, the record indicates that Respondents obtained Parcel B from the Barbs under color of title. Thus, Respondents' use may be tacked to the Barbs' use in order to satisfy the twenty-year-statutory period for a prescriptive easement. The Barbs need only have used the spring for approximately one-half of a year in order for their use, once tacked to Respondents' use, to satisfy the twenty-year-prescriptive period. Although Mr. Kirby could not remember exactly when the permission was granted to the Barbs, there was testimony at trial that the Barbs used the pipeline from the time Mr. Kirby gave permission until the time the Barbs moved approximately twenty years later. Therefore, when tacked to the Barbs' use, Respondents' use clearly meets the requisite twenty-year period for an easement by prescription.

In light of our decision regarding Respondents' right to use water piped from the spring via an easement by prescription, we decline to address the remaining issues raised by Petitioner. We hold that the Court of Special Appeals did not err in affirming the trial court's decision to grant an injunction prohibiting Petitioners from interfering with or obstructing Respondents' use of water from the spring. The judgment of the Court of Special Appeals is affirmed.

396

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.