625 A.2d 1021

**BAUSCH & LOMB INCORPORATED et al.**

v.

**UTICA MUTUAL INSURANCE COMPANY.**

**No. 56, Sept. Term, 1992.**

Court of Appeals of Maryland.

May 12, 1993.

As Corrected on Denial of Reconsideration July 12, 1993.

Argued by Joseph D. Tydings (Jordan S. Stanzler, Mark A. Kolman, Catherine D. Serafin, Jean E. Zimmerman, Anderson, Kill, Olick & Oshinsky, all on brief), Washington, DC, and (Charles R. Taylor, Gordon, Feinblatt, Rothman, Hoffenberger & Hollander, all on brief), Baltimore, for petitioner.

Argued by John B. Wyss (Wiley, Rein & Fielding, Michael R. Cannon, Joseph L. Ruby, all on brief), Washington, DC, and (M. King Hill, III, Venable, Baetjer & Howard, all on brief), Towson, for respondent.

Russell H. Carpenter, Jr., Saul B. Goodman, Douglas M. Gleason, Philip D. Golrick, Covington and Burling, Washington, DC, for The American Petroleum Institute, The American Fiber Mfrs. Ass'n, The Chemical Mfrs. Ass'n, Intern. Business Machines Corp. and Olin Corp.

Emory Plitt, County Atty., Jefferson L. Blomquist, Deputy County Atty., Bel Air, for Hartford County.

J. Joseph Curran, Jr., Atty. Gen. of MD (Pamela D. Marks, Valerie J. Smith, Asst. Attys. Gen., all on brief), Baltimore, for State of MD.

Michael J. Travieso (Gallagher, Evelius & Jones, both on brief), Baltimore, for Johns Hopkins University, University of MD Medical Systems Corp., Allied–Signal Inc., AMG Resources Corp., Baltimore Specialty Steel, Blue Circle America, Chemetals Inc., Chesapeake Finished Metals, Domino Sugar Co., Eastern Stainless Corp., Fallstaff Search, Howard L. Chertkof & Co., Inc., Klein Enterprises, Lenmar Inc., McCorquodale Process Co., Metropolitan Management, Inc., Nat. Gypsum Co., SCM Chemicals, Sweethart Cup Co., Inc. and W.R. Grace & Co.

Roger E. Warin, Diane Hollenshead Copes (Steptoe & Johnson, all on brief), Washington, DC, for Ins. Environmental Litigation Ass'n.

E. Charles Dann, Jr., Stephen E. Marshall (Goodell, De-Vries, Leech & Gray, all on brief), Baltimore, for Md. Cas. Co., U.S. Fidelity & Guar. Co., Government Employees Ins. Co., MD. Ass'n of Mut. Ins. Companies and Fidelity and Deposit Co. of MD.

Lee H. Ogburn (Kramon & Graham, both on brief), Baltimore, for John Richard Ludbrooke Youell, on his own behalf and as a representative of similarly situated Cas.

Underwriters at Lloyd's, London, and British Ins. Companies Trading in the London Ins. Market.

Stephen C. Wilkinson, County Atty., for Allegany County.

Judson P. Garrett, Jr., County Atty., Stephen M. LeGendre, Deputy County Atty., for Anne Arundel County.

H. Emslie Parks, County Atty., for Baltimore County.

Ralph H. France, II, County Atty., for Washington County.

Edgar A. Baker, Jr., County Atty., for Wicomico County.

Edward H. Hammond, Jr., County Atty., for Worcester County.

William R. Bailey, County Atty., for Calvert County.

Charles W. Thompson, Jr., County Atty., for Carroll County.

H. Norman Wilson, Jr., County Atty., for Cecil County.

John S. Mathias, County Atty., for Frederick County.

Barbara Cook, County Sol., for Howard County.

Joyce R. Stern, County Atty., for Montgomery County.

Joseph R. Densford, County Atty., for St. Mary's County.

Clinton S. Bradley, III, President, Talbot County Council.

James M. Slay, Jr., County Atty., for Talbot County.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, KARWACKI and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals, (retired), Specially Assigned.

MURPHY, Chief Judge.

This case focuses upon the meaning and application of certain provisions of a comprehensive general liability (CGL) insurance policy. The primary question presented is whether the insurer must defend or indemnify the insured

as a consequence of groundwater pollution discovered on its industrial site, which entailed expenses of removing soil contaminated with hazardous chemicals. The insured initiated the clean-up without legal proceedings having been formally filed against it by a third party, and without a written administrative directive by a government agency that it take such action.

## I

Utica Mutual (Utica) is a mutual insurance company based in the State of New York. Bausch & Lomb (B & L) is a Fortune 500 manufacturer of health care and optical products with its headquarters in Rochester, New York. The site in question is the Diecraft manufacturing facility, located in Sparks, Maryland, about 15 miles north of Baltimore City. The property consists of some 28 acres; the plant itself was built in 1958, and purchased by B & L in 1965. B & L operated the Diecraft facility for the machining and plating of parts used in telescopes and microscopes.

## A.

Utica sold CGL policies to B & L annually from at least 1970 to 1986. The policy was a standard form document adopted generally throughout the insurance industry, to which were attached certain endorsements or riders negotiated by the parties. The relevant standard language provided:

"The company [Utica] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such ... property damage."

The policy defined an "occurrence" as

"an accident, including continuous or repeated exposure to conditions, which results in ... property damage nei-

ther expected nor intended from the standpoint of the insured."

"Property damage", in turn, was defined as

"physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom."

The policy did not define the term "damages." Nor did it define the word "suit" in that part of the insuring agreement that requires the insurer "to defend any suit against the insured seeking damages on account of ... property damage." [1]

The standard form policy also included 17 specific exclusions from coverage, of which two have some bearing on this case. One provision, paragraph (*l*), excluded coverage for property damage to premises alienated by the insured. The second, paragraph (k), comprised the so-called "own property" provision excluding coverage for property damage to property owned by, occupied by, rented to, used by, or in the care, custody, or control of the insured, B & L. Under a separately negotiated rider, endorsement # 18, the parties eliminated the standard exclusion in paragraph (k) and substituted "own property" coverage with a limit of $50,000 per occurrence.

None of the policies for this period contained an express "pollution exclusion" of the type that is now common in liability insurance contracts. Nor did the policies contain an express endorsement providing for environmental impairment liability coverage. The extent to which the policy reaches, or fails to reach, property damage caused by pollution thus depends on the policy's standard language and the parties' endorsements to it.

---

1. The insurer must defend its insured if it appears from a suit or other sources available at the time that there is a potential of liability under the policy. *Harford County v. Harford Mut. Ins.*, 327 Md. 418, 436, n. 6, 610 A.2d 286 (1992); *Mitchell v. Maryland Casualty*, 324 Md. 44, 62, n. 4, 595 A.2d 469 (1991). *See Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 407–408, 347 A.2d 842 (1975).

B.

The Diecraft plant carried on metal plating activities from 1958 through 1975. The plating created two types of waste, each of which was disposed of on-site. More concentrated plating wastes were first routed into a series of settling tanks, and then into a holding lagoon on the plant grounds; the lagoon measured 20 feet by 60 feet by 6 feet deep. Less concentrated rinse water waste, along with polishing residues and degreasing solvents, traveled first into a holding tank, and then into a set of drywells and overflow pipes located on a downward slope leading to some woods at the facility's western side. Each of the three drywells measured 15 feet in diameter and was 22 feet deep. By design, the liquid waste percolated from the drywells into the surrounding soil; the overflow pipes drained any excess directly to the woods below. None of the disposal techniques departed from accepted industrial practices of the time.

In 1982, B & L first surveyed the facility for pollution in response to employee concerns about these formerly used waste-disposal methods. Tests indicated in November that certain heavy metals, notably nickel and cadmium, had contaminated the ground in the area of the old lagoon; B & L reported these findings to the federal Environmental Protection Agency in February 1983.[2]

---

**2.** The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) gives the federal government broad power to combat contamination of the environment. CERCLA imposes liability on parties designated as responsible for the release of hazardous substances into the air, land, surface water, or groundwater. 42 U.S.C. §§ 9601(8)(B), (14), (22); 9607(a), (b). Under the Act, the federal government may seek an injunction requiring the responsible party to clean up a contaminated site. See 42 U.S.C. § 9606(a). Alternatively, the government may clean up the site and demand reimbursement for its incurred costs, 42 U.S.C. §§ 9604(a)(1), 9607(a), or it may issue an administrative order requiring the responsible party to perform the clean-up, subject to civil fines for a failure to comply. 42 U.S.C. § 9606(a), (b).

In the fall of 1983, B & L engaged Fred C. Hart Associates (Hart), an environmental engineering and consulting firm, to conduct a systematic investigation of the Diecraft property, which began the next year.[3] Hart confirmed the presence of the heavy metal contamination, and concluded that there existed little risk of it migrating.

Further testing in May and October 1984, however, revealed unacceptable levels of a hazardous chemical compound used as an industrial solvent, trichloroethylene (TCE), at the Diecraft site. The TCE contaminated the subsurface groundwater near the disposal drywells and piping network. The TCE also contaminated a small stream, fed by groundwater, cutting across B & L's property and onto an adjacent parcel of land then owned by the Knott Development Corporation.[4] Hart reported these findings to B & L in November 1985. By late 1987, Hart determined the source of the contamination to be the on-site disposal system, primarily sludge at the bottom of the drywells from where the TCE infiltrated the groundwater.

Other events in 1987 merit particular mention. On June 19, 1987, after the adjacent Knott property had been sold to the Highlands Park I Limited Partnership, the new owner wrote to B & L; it claimed TCE contamination of the ground and surface water on its own property, ascribed the pollution to the Diecraft site waste-disposal activities, and threatened to sue. On June 26, 1987, B & L informed Utica of Highlands Park's potential claim, and at the same time requested reimbursement of approximately $76,000 spent to date for testing at the Diecraft facility; this was B & L's

---

**3.** There is some indication in the record that B & L told Hart in February 1984 that it contemplated selling the Diecraft plant, and therefore wished to assess the extent of contamination with that end in mind.

**4.** The parties' expert witnesses at trial agreed that because water tainted by TCE is rapidly cleansed upon exposure to air, the contamination of the stream did not pose a significant threat of further pollution.

first indication to Utica that it expected the insurer to indemnify it for its expenses related to the pollution at Diecraft. In a letter dated July 21, 1987, Utica declined to extend coverage, pending further review of the matter. On November 5, 1987, B & L sold the Diecraft facility as part of a larger purchase and sale agreement with the Cambridge Instrument Company of Great Britain, with B & L retaining all environmental liabilities related to Diecraft; B & L further agreed to reserve and apply up to $1 million of the purchase price for environmental clean-up costs at the site. All subsequent negotiations between insurer and insured as to coverage having failed, Utica on November 20, 1987, sued for a declaratory judgment defining the rights and obligations of the parties to the insurance contract.

From March 23 through April 27, 1988, *i.e.* after the litigation had begun, B & L carried out the pollution treatment program devised by Hart. The contaminated sludge was excavated from the drywells and shipped off-site. The former lagoon area was excavated and then filled with clean earth. The waste holding tank and the associated network of pipes were removed. All of these measures dealt with the contaminated soil and equipment. No direct steps, such as pumping and aeration, were taken to cleanse the site's tainted groundwater.

## C.

Punctuating this sequence of events were certain contacts between B & L and Maryland State agencies. Drawing on the information B & L had supplied to the federal E.P.A. in February of 1983, the State Waste Management Administration included the Diecraft facility on the master list of potentially hazardous sites, which it published on August 31, 1984 in the *Maryland Register.* The agency published its decision to conduct a preliminary assessment of the facility in the *Maryland Register* of August 2, 1985. State officials completed their preliminary investigation in

December of that year.[5]

On July 22, 1986, representatives of B & L and the State had their first substantive meeting, during which B & L indicated its intention to perform the necessary testing and clean-up of the Diecraft site. Thereafter, the State periodically received, reviewed, and commented on the tests and remediation plans done for B & L by the Hart engineers. Hart manager, Steven B. Gelb, testified that his engineers worked in a "cooperative arrangement" with the State: "We would recommend work. They would comment on activities. If we didn't agree on something, we would negotiate it and iron it out so that both parties were satisfied." The State approved the sludge removal plan in 1988.

B & L's director of administrative services, James Goff, stated that the B & L management committee wished to cooperate with the State in cleaning up the Diecraft pollution, and, in so doing, avoid being subjected to an administrative order to perform the work. State environmental enforcement official, Frank Henderson, testified that the Waste Management Administration insisted upon approving B & L's remediation plans, in order to assure that the source of the contamination was removed properly. Ronald

---

5. Under various provisions of the Maryland Code, the State Department of the Environment is authorized to issue orders and permits that prohibit or otherwise control the discharge of hazardous pollutants into Maryland waters. *See* Maryland Code (1982, 1987 Repl. Vol., and 1992 Cum.Supp.) §§ 7–207(a)(2); 9–319(a)(7); 9–322—328 of the Environment Article. The Code designates the party responsible for pollution as the owner or operator of a site containing hazardous substances without regard to negligence or other degree of fault. *See* § 7–201(x) of the Environment Art. As under the federal legislation, the State may seek an injunction to arrest threatened contamination, or require a property owner or operator to remediate a polluted site. *See* § 7–222(a)(2)(iii). The State may also draw upon its Hazardous Substance Control Fund to perform a remediation itself. Sections 7–220, 7–222(a). The party responsible for the pollution must then reimburse the State for any expenditures incurred as part of the remedial action. Section 7–221. A violation of the statutes or of the State's regulations or orders pertaining to pollution control may result in civil and criminal penalties. Sections 7–265—267.

Nelson, the director of the Waste Management Administration, testified that once the State had listed a property as a potentially hazardous site, the property owner did not enjoy the option of doing nothing; any testing and clean-up necessary to comply with environmental laws and regulations would be done either by the owner, acting voluntarily or under an injunction, or by the appropriate government agency at the owner's expense. Nelson added that B & L's posture in its response to the Diecraft pollution was one of "uncontested compliance" with State laws and regulations.

At no time did the State or any neighboring landowner sue B & L for money damages or for injunctive relief. Nor did the State file administrative proceedings against B & L, ordering it to clean up its Diecraft facility. At no time did the federal Environmental Protection Agency ever send a so-called "PRP" letter to B & L designating it as a "potentially responsible party" in regard to the pollution at its Diecraft site.

## II

Utica began the litigation by suing B & L in the Circuit Court for Baltimore County. It sought a declaratory judgment that it had no obligation to defend or indemnify B & L for expenses incurred in connection with the groundwater contamination at the Diecraft facility. In its complaint, Utica recited that B & L suspected or determined in 1983 that it had generated and discharged liquid wastes and other contaminants at the site; that this contamination was confirmed by studies conducted between 1984 and 1985; that the State's Department of the Environment informed B & L in 1985 that the Diecraft plant was included on a list of hazardous waste sites to be evaluated under Maryland's pollution laws; and that B & L did not notify Utica of these facts until June 1987, over three years later, upon receipt of the threatening letter from the neighboring property owner, Highlands Park.

Utica averred in the complaint that it had no obligation to defend or indemnify B & L for investigation and site remediation at the Diecraft property because B & L had failed, to Utica's detriment, to give it prompt notice of the happening of an "occurrence," as required by the policy. It further contended that B & L's investigation and site remediation efforts did not constitute either a claim for "damages" or a claim arising from "property damage" within the policy's contemplation; that there had been no "occurrence" as such; and that B & L had voluntarily incurred costs of investigation and site remediation without its consent, as required by the policy, therefore barring B & L from obtaining indemnification. Utica also averred that coverage was subject to the policy's paragraph (k), which excluded property damage to B & L's own property in excess of $50,000 per occurrence during the policy period.

B & L answered Utica's suit and counterclaimed for breach of contract. It asserted that Utica failed to provide B & L with full investigation, defense, and indemnification, as required by the policy. B & L claimed that Utica was liable to it for all costs of investigation, defense, damages, costs, and payments (whether by judgment, settlement, or otherwise), together with the costs of the declaratory judgment action, including reasonable attorneys' fees.

The trial lasted ten days, during which the parties adduced evidence concerning the extent of the pollution at Diecraft and its remediation. They also presented evidence of their respective understandings of the insurance policies based, in part, on their prior course of dealing in other matters and on general insurance practices.

The trial court (Fader, J.), in the judgment declaring the rights of the parties, determined that Utica was required under the policy provisions "to defend claims and to pay damages because of property damage for clean-up costs for hazardous waste materials" at Diecraft. It fixed the actual clean-up costs at $231,262.53. The court further decided that Utica had a duty to defend future actions "brought to

compel removal of hazardous waste material, and to pay the cost of removing such material, if any, from the Diecraft site depending on whether potential for liability exists in the claim made and removal is required by the State of Maryland under applicable law, the extent of which will depend on future events."

The court also declared that, "Utica had, and in the future will have, no legal responsibility to defend or pay investigatory damages required by the State ... to monitor the Diecraft site before or following removal of hazardous material." Moreover, it determined that the policy did not cover B & L's expenses in investigating and testing the polluted site, which through the date of trial amounted to $529,897.30. The court concluded that the policy did not cover State personnel costs "for regulatory management" of the work, for which the State sought reimbursement from B & L.

In so declaring the rights of the parties under the policy, the trial judge concluded in remarks from the bench (he filed no written opinion) that the State had confronted B & L with a claim that merited insurance coverage. He said:

"There is no question in my mind but that the total circumstances constitute the sufficient coerciveness and advers[eness] of an administrative body ... and a degree of definiteness which indicate that this was in fact a suit, a demand for damages and money, to a certain extent, that the State had the right to require to be paid.

* * * * * *

"[O]verall the testimony shows that from the State people, that they ordered it [the clean-up], they said this is what needed to be done. They stated that the ideology of this was the [State] Superfund law. There is no question but that they were going to require compliance and

that Bausch and Lomb did make that compliance.

\* \* \* \* \* \*

"With regard to the Highlands claim, that was sufficient to show a demand and was specifically keyed for 'my property is hurt because of hazardous waste on your property' and that certainly constitutes sufficiency as far as a suit."

The court, in addressing the term "damages" as used in the policy, found it ambiguous in meaning, and therefore required a broad construction; it stated:

"I am convinced ... that it had a wide and expansive type of meaning and what it meant was anything that a third party can make you pay for because of damage to that third party's property. Now, I don't think it is anything more difficult than that. I think that is what [the policy] says."

The trial court ruled that the alienated premises exclusion in the policy did not apply because the harm leading to the sludge removal costs had occurred before the November 5, 1987, sale of the property to Cambridge Instrument. Judge Fader also declined to apply the limited "own property" exclusion, holding that the State's regulatory power in respect to groundwater constituted an interest sufficient to trigger coverage for liability to a third party, the State, beyond the title owner of the water, B & L.

In addition to the actual clean-up expenditures, the court awarded B & L costs, expenses in the amount of $44,306.47, and attorneys' fees of $534,500.

The parties cross-appealed to the Court of Special Appeals, which reversed and ordered the entry of a declaratory judgment in favor of Utica. *Utica Mutual v. Bausch & Lomb*, 91 Md.App. 1, 603 A.2d 1241 (1992). The intermediate appellate court, relying on *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987) and *Maryland Cup v. Employers Mutual*, 81 Md.App. 518, 568 A.2d 1129 (1990), held that remedial costs incurred to comply with environ-

mental regulations were not "damages" within the insurance policy's meaning. *Utica Mutual, supra,* 91 Md.App. at 14–16, 603 A.2d 1241.

*Armco,* the court pointed out, involved a CGL policy whose provisions were very similar to those in the present case. There the insurer sought a declaratory judgment concerning its liability to its insured, Armco, which arose out of a suit brought by the United States for reimbursement and injunctive relief because of the alleged threat to the environment at a hazardous waste site in Missouri. As the Court of Special Appeals observed, *Armco,* purporting to apply Maryland law, held that the government's "claim seeking compliance with regulatory directives of a federal agency, which compliance takes the form of obedience to injunctions and reimbursement of remedial costs, does not constitute a claim for 'damages' under the insurance policy," *Id.* at 14, 603 A.2d 1241, quoting *Armco,* 822 F.2d at 1350. According to *Armco,* the CGL policy reimbursed "only damages arising from actual, tangible injury," and not "essentially prophylactic measures" unconnected with any harm to property of specific third parties. 822 F.2d at 1353. The intermediate appellate court further cited its own *Maryland Cup* opinion holding that claims seeking equitable relief in response to alleged employment discrimination did not represent "damages." 91 Md.App. at 15–16, 603 A.2d 1241.

Relying upon *Schlosser v. INA,* 325 Md. 301, 600 A.2d 836 (1992), the Court of Special Appeals further held that B & L's clean-up measures were not tantamount to damages for liability in that they were preventive in nature, and undertaken to avoid a lawsuit that might otherwise have materialized in the future. 91 Md.App. at 20, 603 A.2d 1241. Finally, the court found no merit in B & L's argument that the groundwaters underlying the Diecraft site belonged to the State, and that by contaminating these groundwaters, it had harmed the property of a third party, thereby obligating the insurer to pay damages in the form of clean-up costs. *Id.* at 16, 603 A.2d 1241. The court noted that while

the State has a proprietary interest in the nature of a *quasi* trusteeship for the public benefit in the navigable waters within its boundaries, the State has asserted no claim of ownership to waters beneath the surface of privately-owned land. It said:

"The State, as Trustee for its citizens, does have the authority, within its police power, to preserve its natural resources and to prevent pollution to air and water. But such power and authority does not depend upon any claim of ownership of either the water below the surface of the land or the air above it.

"Moreover, even if there were any merit in the argument that damage had been done to the State's property, that would be irrelevant to this case. The damages that were awarded by the lower court were for costs incurred in removing waste materials from B & L's own property—materials that it itself had placed there—and for counsel fees incurred in dealing with the State and in defending Utica's declaratory judgment action. Neither the State nor any neighboring property owner has asserted a claim for damage to its, his, or her property; no costs of defending such claims, and no award of damages for property damage sustained by the State or anyone else (other than B & L) as a result of B & L's dumping of waste products on its property is involved in this case." *Id.* at 17, 603 A.2d 1241.

We granted the parties' cross-petitions for certiorari. 327 Md. 557, 611 A.2d 115. B & L asks us to decide whether the standard form CGL policy insured against the costs of cleaning up the environmental contamination at Diecraft, and related expenses, to satisfy State regulations. To this Utica adds a series of related questions in its cross-petition, which were presented for determination at the trial: whether B & L's uncontested assumption of the duty to clean the facility, without notice to Utica or its consent, breached the insurance contract; whether the policy insured against clean-up costs flowing from B & L's promise to Cambridge Instrument to have the Diecraft facility comply with health

and safety regulations in the absence of any written allega-tions, demands, or directives by the State; whether the alienated premises exclusion barred insurance coverage; whether coverage was barred by B & L's initial delay in disclosing the contamination to the insurer; whether the negotiated "own property" limitation of $50,000 applied in this case; and whether Utica appropriately and justifiably began the declaratory judgment action, thereby vitiating B & L's claims for attorneys' fees.

## III

The trial of this dispute lasted two weeks. It resulted in a voluminous record. Counsel for the litigants and *amici* have called our attention to no fewer than 130 cases. The briefs and references of the parties and *amici curiae* total many hundreds of pages, leading us to observe, as did the Supreme Court of New Hampshire, that, "No small forest fell to deliver their contentions to our steps." *Coakley v. Maine Bonding and Casualty Co.*, 136 N.H. 402, 618 A.2d 777 (1992).

Distilling the litigation to its essence, we must first interpret the standard provisions of a comprehensive general liability insurance policy. The policy-holder, B & L, insists that the notion of the policy's comprehensiveness, reaching all unknown and undefined harms that might occur after the insurance contract takes effect, controls this case. The policy's broad reach, says B & L, covers its costs for removing the contaminated sludge in obedience to the State's statutory and regulatory commands protecting the water supply. The insurer, Utica, insists that the policy insures only against harm done to a third party who demands compensation for the loss. Here, says Utica, the policy-holder in voluntarily cleaning up its own facility merely complied with one of myriad government regulations, the expense of which compliance is a cost of doing business.

Cases in other jurisdictions dealing with insurance coverage of environmental clean-up costs under a comprehensive general liability policy abound. In confronting the legal issues present in the instant case, the majority of state appellate courts have concluded that the standard insuring language covers environmental response costs. They have construed the term "damages" to reach both monetary compensation to government agencies or aggrieved third parties and the expense of complying with environmental injunctions. *See, e.g., AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); *A.Y. McDonald Industries v. INA,* 475 N.W.2d 607 (Iowa 1991); *Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576 (1990); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175 (Minn. 1990); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.,* 326 N.C. 133, 388 S.E.2d 557 (1990); *Boeing Co. v. Aetna Cas. & Sur. Co.,* 113 Wash.2d 869, 784 P.2d 507 (1990); *Compass Ins. Co. v. Cravens, Dargen & Co.,* 748 P.2d 724 (Wyo.1988). *Contra Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16 (Me.1990) (insurance contract language providing coverage for amounts the insured is "legally obligated to pay as damages" does not cover expenses incurred in meeting state clean-up demands). *See also Coakley, supra,* 136 N.H. 402, 618 A.2d 777 (remedial response costs covered, but containment plan to prevent contamination of groundwater does not qualify as damages).

The federal courts divide more or less evenly on the question. Among their decisions imposing coverage for environmental remediation are *Hays v. Mobil Oil Corp.,* 930 F.2d 96 (1st Cir.1991) (applying Massachusetts law); *Avondale Indus. Inc. v. Travelers Indem. Co.,* 887 F.2d 1200 (2d Cir.1989) (applying New York law); *Port of Portland v. Water Quality Ins. Syndicate,* 796 F.2d 1188 (9th Cir.1986) (applying Oregon law); *Independent Petrochemical Corp.*

*v. Aetna Casualty & Sur. Co.*, 944 F.2d 940 (D.C.Cir.1991) (applying Missouri law); *Chesapeake Utils. Corp. v. American Home Assurance Co.*, 704 F.Supp. 551 (D.Del.1989) (interpreting Maryland law as to "damages"); *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Sur. Co.*, 788 F.Supp. 846 (D.N.J.1992) (applying New Jersey law); and *Federal Insurance Co. v. Susquehanna Broadcasting Co.*, 727 F.Supp. 169 (M.D.Pa.1989), *aff'd*, 928 F.2d 1131 (3rd Cir.1991) (applying Pennsylvania law).

By contrast, other federal courts have denied insurance coverage to CGL policy-holders who incur clean-up costs under environmental statutes and regulations. These courts hold that the term "damages" does not embrace such expenses. In reaching this result, they offer one or more of several rationales: a) damages has an unambiguous, technical meaning in the insurance context that is distinct from equitable or restitutional remedies; b) the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, at § 107(a)(4), 42 U.S.C. § 9607(a)(4), itself differentiates between clean-up costs and damages proper; c) an insured's response costs exist conceptually apart from property damage to a third party; or d) if the term were given an ordinarily broad meaning, the policy's phrase "obligated to pay as damages" would be redundant; it would require coverage for any obligation to pay money, and would improperly reduce the words "as damages" to surplusage. *See, e.g., Continental Ins. v. Northeastern Pharmaceutical*, 842 F.2d 977 (8th Cir.1988) (en banc) (applying Missouri law); *Armco, supra*, 822 F.2d 1348 (applying Maryland law); *Mraz v. Canadian Universal Ins. Co., Ltd.*, 804 F.2d 1325 (4th Cir.1986) (as evidenced by CERCLA provisions, response costs are an economic loss, rather than property damages); *U.S. Fidelity & Guaranty Co. v. Morrison Grain Co.*, 734 F.Supp. 437 (D.Kan.1990) (applying Kansas law); *Aetna Cas. & Sur. Co. v. Gulf Resources & Chem. Corp.*, 709 F.Supp. 958 (D.Idaho 1989) (applying Idaho law); *Hayes v. Maryland Cas. Co.*, 688 F.Supp. 1513 (N.D.Fla.1988) (applying Florida law).

## IV

■■■■ Under Maryland law, when deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself. *Mitchell v. Maryland Casualty*, 324 Md. 44, 56, 595 A.2d 469 (1991); *Mut. Fire, Marine & Inland Ins. v. Vollmer*, 306 Md. 243, 250, 508 A.2d 130 (1986). Unless there is an indication that the parties intended to use words in the policy in a technical sense, we accord the words their usual, ordinary, and accepted meaning. *Mitchell, supra,* 324 Md. at 56, 595 A.2d 469; *Cheney v. Bell National Life,* 315 Md. 761, 766, 556 A.2d 1135 (1989). A word's ordinary signification is tested by what meaning a reasonably prudent layperson would attach to the term. *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486 (1985). Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer. *Cheney, supra,* 315 Md. at 766, 556 A.2d 1135. Rather, as with contracts generally, the parties' intention is to be ascertained from the policy as a whole. In the event of an ambiguity, courts may consider extrinsic evidence as to the meaning of policy language. *Id.* at 766–767, 556 A.2d 1135; *Pacific Indemnity, supra,* 302 Md. at 388–389, 488 A.2d 486.

Bearing these principles in mind, we return to the critical language in the standard policy: "The company [Utica] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies."

### A. *"shall become legally obligated to pay"*

■■■■ Judging from the evidence adduced at trial, the interaction between B & L and the State in regard to the Diecraft clean-up was somewhat problematic. B & L acted throughout in a cooperative manner with State regulators in assessing the pollution's extent and devising plans to treat it. It is less certain that B & L acted purely voluntarily in doing so. First, all parties concede that the relevant

environmental statutes, as outlined above, impose strict liability upon the owners of polluted property; the statutes further grant the State the authority to enforce the laws either by administrative order, by injunction, or by the State's own, direct remediation at the owner's expense. *See supra,* n. 5. The tacit threat of formal State intervention was thus always present in B & L's dealings with the State regulators.

Second, the immediate contacts between B & L and State personnel carried weight in the clean-up project. State regulators reviewed and approved B & L's studies and subsequent remediation program; implicit in their approval was the power to disapprove, and demand that more be done. To be sure, the State agents did not adopt an overtly adversarial and coercive posture towards B & L. The State did not sue the company. It issued no order. *See Ryan v. Royal Ins. Co. of America,* 916 F.2d 731, 736–743 (1st Cir.1990) (under New York law, State's mild statements did not create showing of probable and imminent governmental action required as a condition precedent to insurance coverage). Yet "polite but puissant compulsion" may inhere to State regulatory activities, especially when, as here, the regulators actively monitor the clean-up. *A.Y. McDonald Industries, supra,* 475 N.W.2d at 620 (quoting *Aerojet–General Corp. v. Superior Court,* 211 Cal.App.3d 216, 228, 257 Cal.Rptr. 621, 628 (1989)). B & L ultimately faced the task of complying with the environmental laws, and paying the costs of compliance. As such, for the purposes of this analysis, we accept the trial court's finding that B & L's response costs, undertaken in the regulatory context, represented a sum the corporation was legally obligated to pay.

## B. *"as damages"*

 Nowhere in the contract is there any express indication that the parties wished to ascribe a special or technical meaning to the term "damages." Unlike many other terms used throughout the document, the word is not listed in the policy's definitions section with which the contract begins.

We shall, therefore, give the word its ordinary and accepted meaning as used and understood by reasonably prudent laypersons in daily life. Our first resort is to a general dictionary, which defines "damages" as "the estimated reparation in money for detriment or injury sustained." *Webster's Third New International Dictionary of the English Language* 571 (1981). A very similar definition, "the estimated reparation in money for injury sustained," is found in Lewis E. Davids, *Dictionary of Insurance* 85 (6th ed. 1983). These definitions comport with the trial court's succinct observation that the term means "anything that a third party can make you pay for because of damage to that third party's property."

In its view of Maryland law governing the construction of insurance policies, the United States Court of Appeals for the Fourth Circuit in *Armco* consciously adopted a "narrow, technical definition" of damages. *Armco, supra,* 822 F.2d at 1352. The court interpreted the term to mean payments to third parties having a claim for legal damages, as distinguished from claims for traditional equitable remedies. *Id.*[6] The *Armco* court reasoned further that because the insured's compliance costs satisfied the government's equitable claims for injunctive and restitutionary relief, those costs did not qualify as compensable legal damages under the policy. *Id.* at 1352–1353.

To the extent it suggests that the term "damages" imports a distinctively legal meaning in insurance matters, *Armco* misperceives the law of Maryland. As discussed earlier, we accord to words their usual and accepted signification. "Damages" in common usage means the reparation

---

6. Paradoxically, the Fourth Circuit took this position immediately after acknowledging the principles of *Pacific Indem. v. Interstate Fire & Cas., supra,* 302 Md. at 388, 488 A.2d 486, that the terms of an insurance contract are to be construed according to the meaning a reasonably prudent layperson would infer. We observe, too, that the Fourth Circuit in supporting its technical construction of damages relied on only one case purporting to apply Maryland law, *Haines v. St. Paul Fire & Marine Ins. Co.,* 428 F.Supp. 435 (D.Md.1977), which itself did not cite any Maryland authority on the point in question.

in money for a detriment or injury sustained. The reasonably prudent layperson does not cut nice distinctions between the remedies offered at law and in equity. Absent an express provision in the document itself, insurance policy-holders surely do not anticipate that coverage will depend on the mode of relief, i.e. a cash payment rather than an injunction, sought by an injured party. Policy-holders will, instead, reasonably infer that the insurer's pledge to pay damages will apply generally to compensatory outlays of various kinds, including expenditures made to comply with administrative orders or formal injunctions. The ordinary person understands "damages" as meaning money paid to make good an insured loss.[7] In this context, environmental response costs fall within that definition.

■ There is merit to Utica's argument that an overly broad interpretation of the term renders the policy language "pay as damages" redundant by ignoring the intended limitation on the insurer's obligation to pay. It is a recognized rule of construction that a contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause or phrase so that a court does not cast out or disregard a meaningful part of the writing. *Dahl v. Brunswick Corp.*, 277 Md. 471, 478–479, 356 A.2d 221 (1976); *Sagner v. Glenangus Farms*, 234 Md. 156, 167, 198 A.2d 277 (1964). Nevertheless, we do not think that a construction of the phrase "pay as damages" based on the ordinary meaning of the words improperly reduces the concept of damages to mere surplusage. The payment of damages—even broadly defined—remains distinct from other expenditures, such as fines, penalties, or assessments, which would not be covered under the CGL policy. *See Indept. Petrochemical v. Aetna Cas. & Sur. Co., supra,*

---

7. A recent scholarly essay suggests that the insurance industry itself accorded to the term "damages" a broad, inclusive meaning within the standard CGL policy. *See* Jordan S. Stanzler and Charles A. Yuen, *Coverage for Environmental Cleanup Costs: History of the Word "Damages" in the Standard Form Comprehensive General Liability Policy,* 3 Columbia Bus.L.R. 449, 457–487 (1990).

944 F.2d at 947 (a fine or penalty is not understood to be dollar-for-dollar recompense for injury, but is a pecuniary form of punishment for acts society seeks to deter). Our construction does not oblige the insurer to pay any and all sums attendant to an insured loss.

### C. *"because of ... property damage to which this insurance applies"*

A hallmark of the comprehensive general liability policy is that it insures against injury done to a third party's property, in contradistinction to an "all-risks" policy also covering losses sustained by the policy-holder. *See Schlosser v. INA, supra,* 325 Md. at 306–07, 600 A.2d 836. The policy at issue defines property damage as a "physical injury to or destruction of tangible property ... including the loss of use thereof." The instant question of insurance coverage turns, therefore, on whether a third party has sustained injury to, or destruction of, its own property with respect to the Diecraft pollution. We thus focus on whether the State of Maryland possessed the requisite property interest in the groundwater affected by the TCE contamination to qualify it as a third party whose property was damaged by the pollutants emanating from the Diecraft site.

In regard to surface waters, although the State is said to be the owner of the navigable waters within its boundaries, it holds them not absolutely, but as a quasi trustee for the public benefit and to support the rights of navigation and fishery to which the entire public are entitled therein. *Baltimore City v. Steamboat Co.,* 104 Md. 485, 494, 65 A. 353 (1906). *See Browne v. Kennedy,* 5 H. & J. 195 (1821) (citing grant of lands and waters in the original Charter to Lord Baltimore); *see also Bd. of Pub. Works v. Larmar Corp.,* 262 Md. 24, 46, 277 A.2d 427 (1971) (navigable waters and the land under them have always been a part of the public domain); *State of Maryland, Dept. of N. Res. v. Amerada Hess Corp.,* 350 F.Supp. 1060 (D.Md.1972) (State has property interest sufficient to recover damages

resulting from oil discharge into Baltimore harbor). Such is the extent of the State's proprietary interest in harbors, bays, rivers, and similar waters.

There exists another body of law, however, pertaining to subterranean waters. The groundwaters under the Diecraft facility are considered to be percolating waters, that is, those "which ooze, seep or filter through soil beneath the surface, without a defined channel, or in a course that is unknown and not discoverable from surface indications." *Finley v. Teeter Stone, Inc.*, 251 Md. 428, 432, 248 A.2d 106 (1968). Two lines of authority apply to interests in groundwater. Under the older English Rule, the owner of the freehold was deemed to own absolutely all of the percolating waters beneath the surface of the land, just as he owned the soil and minerals beneath the surface and the air and sky above it. *Id.* at 434–435, 248 A.2d 106. Under the more modern American Rule, the landowner is limited to a reasonable exercise of the owner's proprietary right in the water, i.e., such an exercise as may be reasonably necessary for some useful or beneficial purpose, before obstructing, diverting, or removing percolating water to the injury of a neighbor. *Id.* at 436, 248 A.2d 106.[8]

While having suggested a preference for the American Rule, *see id.* at 439, 248 A.2d 106; *Western Md. R.R. Co. v. Martin*, 110 Md. 554, 566, 73 A. 267 (1909), this Court has never designated one rule or the other as the law of Maryland. There is no need to do so here. The common-law principles of groundwater were created to adjudicate disputes between neighboring property owners who claimed a right to use the waters beneath their lands. That is not the case before us now. The instant case concerns the nature and scope of the State's interest in the groundwater

8. Notwithstanding even the rule of absolute dominion, a landowner at common law has no right to contaminate the groundwater percolating below the surface, thereby polluting a neighbor's water. *See* L.S. Tellier, Annotation, *Liability for Pollution of Subterranean Waters*, 38 A.L.R.2d 1265, 1268–1279 (1954).

as it bears on the meaning of the standard CGL insurance policy. This is a question of first impression for the Court.

Neither the Maryland Constitution nor any statute proclaims the State to be the owner of waters within its borders. This silence contrasts with the laws of many of the Western states, which explicitly confer ownership of water resources upon the State or its people. *See, e.g., AIU Ins., supra,* 274 Cal.Rptr. at 8, n. 6, 799 P.2d at 1261, n. 6 (California); *Minnesota Min. & Mfg., supra,* 457 N.W.2d at 182 (Minnesota); *Port of Portland, supra,* 796 F.2d at 1193 (Oregon); *see also* Peter A. Fahmy, Note, *The Public Trust Doctrine as a Source of State Reserved Water Rights,* 63 Denver U.L.R. 585, 598–599 (1986).

The statutes of Maryland contain many provisions pertaining to the State's regulatory maintenance of clean water. As part of the regulatory scheme, the legislature has defined "waters of the State" and "waters of this State" to include both surface and underground waters within the boundaries of Maryland subject to its jurisdiction. *See* Maryland Code (1973, 1990 Repl.Vol., 1992 Cum.Supp.) § 8-101(j) of the Natural Resources Article and (1982, 1987 Repl.Vol., 1992 Cum.Supp.) § 9-101(*l*) of the Environment Article. It is reasonable to apply that definition as well to "State waters." *See, e.g.,* § 4-401(d) of the Environment Article.

In regard to water pollution control, the legislature has stated as public policy that "the quality of the waters of this State is vital to the public and private interests of the citizens of its citizens and ... pollution constitutes a menace to public health and welfare." Sections 4-402, 9-302(b) of the Environment Article. It is the policy of the State to control the appropriation or use of State waters "[i]n order to conserve, protect, and use water resources of the State in accordance with the best interests of the people of Maryland." Section 8-801(a) of the Natural Resources Article. Respecting the 1978 Environmental Standing Act, the General Assembly found that improper use and exploitation of

natural resources represented an invasion of "the right of every resident of Maryland to an environment free from pollution." Section 1–502 of the Natural Resources Article.

The 1973 Maryland Environmental Policy Act declared that the protection of the environment is necessary for the public health and welfare as a matter of the highest public priority, and that each person has a "fundamental and inalienable right" to a healthful environment. Section 1–302(b), (d) of the Natural Resources Article. The same statute in Section 1–302(c) directs that State agencies must conduct their affairs as "stewards of the air, land, [and] water ... resources"; in common usage, a steward is one who cares for the property or interests of another. Thus the legislature has attributed to the State broad powers in respect to water resources, including groundwater. Taken collectively, with due regard to the statutes' articulation of the State's interests in preserving the environment, these legislative pronouncements demonstrate that the State has committed itself to regulatory oversight of the groundwaters of Maryland to benefit its citizens.

We do not share the view of B & L and its supporters among the *amici curiae* that such statutory references to "waters of the State" or "State waters" imply a proprietary interest in groundwater vested in the State. These phrases are simply generic usage addressing the location of waters within State borders, just as one might refer to Johns Hopkins University, a private institution, as one of the colleges of Maryland subject to appropriate regulation. We also observe that in some instances the phrases "waters *of* the State" and "waters *in* the State" are used in a single statute, with no apparent difference between the two. *See, e.g.,* § 8–704(b–1)(1) of the Natural Resources Article. Courts in other jurisdictions have construed the two terms to have the same meaning. *See Dargan v. Richardson, Game Warden,* 229 S.C. 135, 92 S.E.2d 167, 170 (1956); *State v. Taylor,* 358 Mo. 279, 214 S.W.2d 34, 37 (1948); *Caldwell v. Erickson,* 61 Utah 265, 213 P. 182, 184 (1923).

Moreover, there is nothing in these environmental statutes' legislative history, which we have painstakingly reviewed, to indicate that the legislature ascribed ownership of groundwater to the State. The term "waters of the State" has no significance with respect to the proprietary ownership of such waters. 44 Op.Atty.Gen. 178 (Md.1959).

Secondly, the proponents of coverage cite dicta pronounced by Justice Holmes in a dispute over an injunction to abate air pollution, which they would have us apply to the instant case involving groundwater pollution:

"This is a suit by a state for an injury to it in its capacity of quasi-sovereign. In that capacity the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain."

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907). This argument is answered by the more recent line of cases culminating in *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982), which specifically addressed the question of groundwater. As part of a larger Commerce Clause analysis, the Supreme Court stated that while the surface owner who withdrew groundwater enjoyed a lesser ownership interest in it than the captor of game birds or fish,[9] the state claim to the water rested nonetheless on "the legal fiction of state ownership." 458 U.S. at 951, 102 S.Ct. at 3461. The Supreme Court has definitively recast the public ownership theory as " 'but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.' " *Id.*, quoting

---

**9.** The Supreme Court's analysis of Nebraska's claim was colored by the recognized need to conserve scarce water resources in the arid Western states. *See* 458 U.S. at 952–953, 102 S.Ct. at 3462–3463. The Supreme Court of Nebraska had previously determined that individual ownership of groundwater was constrained by common law, statute, and the Nebraska constitution. *State ex rel. Douglas v. Sporhase*, 208 Neb. 703, 305 N.W.2d 614, 617 (1981).

*Hughes v. Oklahoma,* 441 U.S. 322, 334, 99 S.Ct. 1727, 1735, 60 L.Ed.2d 250 (1979). *See Toomer v. Witsell,* 334 U.S. 385, 402 n. 37, 68 S.Ct. 1156, 1165 n. 37, 92 L.Ed. 1460 (1948) (noting that the fiction apparently gained currency partly as a result of confusion between the Roman term *imperium* or governmental power to regulate, and *dominium* or ownership).

Here the question of groundwater ownership arises in the context of a potentially insurable injury by pollution, rather than commercial exploitation of the resource. Yet the tenet animating *Sporhase* informs the instant case as well. The State's activities at the Diecraft site vindicated its regulatory prerogatives. The State's interest in groundwater rests on its power to preserve and regulate. That power does not constitute a property interest within the contemplation of the insurance policy in dispute. We hold, in sum, that in the absence of third-party property damage, Utica was not obliged by the standard terms of the CGL contract to pay B & L's abatement expenses incurred at the State's behest.

## V

Commentators raise a public policy concern that relieving the insurer of a putative obligation to pay response costs will inhibit property owners from responding to pollution. The environment will suffer further harm, they contend, as owners wait until a clear third-party injury manifests itself and prompts a lawsuit. *See* Stephen Mountainspring, *Insurance Coverage of CERCLA Response Costs: the Limits of "Damages" in Comprehensive General Liability Policies,* 16 Ecol.L.Q. 755, 797–798 (1989); *see also* Tracey Cordes, Note, *Who Gets the Bill?: Determining Insurers' Duty to Defend and Indemnify against Hazardous Waste Clean–Up Costs under General Liability Policies,* 18 Env.L. 931, 953–954 (1988); Mark K. Suri, Note, *Taking the Insurers to the Dumps: Interpreting "Damages"—Is there Coverage for Hazardous Waste Cleanup Costs under Comprehensive General Liability Insurance?,* 13 J.Corp.L. 1101, 1117 (1988).

There is not the remotest indication in the record before us consistent with that fear. B & L responded promptly and responsibly to the first discovery of contamination at the Diecraft facility. It acted cooperatively with State regulators. It was conscious of its own self-interest in maintaining the marketability of its plant by abating the pollution. Most significantly, B & L steadily pursued the abatement project, on its own initiative, for more than *four years*—from November 1982 to June 1987—before raising with Utica the question of insurance coverage for environmental response costs. The existence or lack of insurance apparently figured not at all in B & L's response to the pollution over those four years.

Only the June 19, 1987, letter of complaint from the neighboring parcel-owner, Highlands Park, spurred B & L to bring Utica into the picture. Highlands then let the matter drop. Its threat to seek recompense for harm to its surface and groundwaters never materialized into more formal action. Had Highlands made a legitimate claim for damages, Utica would have been obliged to pay the costs of any direct remediation of the Highlands property itself. We need not decide now whether, in response to a claim from Highlands, Utica would have been required to pay the costs of indirect steps taken on B & L's own Diecraft site, such as removal of the contaminated sludge, to prevent continuing harm to its neighbor. *See Schlosser, supra,* 325 Md. 301, 600 A.2d 836 (costs incurred by contractor to avoid imminent catastrophic damage to property of others were not recoverable under terms of CGL policy).

One last point deserves emphasis in regard to the dangers of pollution. This case does not present a challenge to the State's authority to safeguard the environment. The State's power, pursuant to the environmental statutes, to regulate, monitor, and intervene in cases of pollution remains entirely intact. The environmental statutes amply express sound public policy, and provide the means by which State agencies may secure the public interest in clean groundwater.

 The instant dispute, instead, turns strictly on the question of which party to an insurance policy shall pay for the clean-up of a polluted site. That question is governed by the contract between insurer and insured. Maryland courts are reluctant to obviate voluntary bargains on public policy grounds, and to diminish the public interest in having individuals and corporations exercise broad powers as they structure their own affairs. *Finci v. American Casualty,* 323 Md. 358, 378–379, 593 A.2d 1069 (1991); *Md.–Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 606, 386 A.2d 1216 (1978). Under its insurance contract with Utica, B & L's cost of compliance with State regulations represented an economic loss apart from third-party property damage.

## VI

 The Court of Special Appeals reversed, as erroneous, the trial court's award to B & L of costs, expenses, and attorney fees in the declaratory judgment action. The intermediate appellate court concluded, "[S]ince Utica was under no obligation to defend, indemnify, or reimburse B & L with respect to the claim or potential claim of the State, it breached no duty to defend and its declaratory judgment action was appropriate and justified." The Court of Special Appeals' determination is consistent with prior decisions of this Court. *See Collier v. MD–Individual Practice,* 327 Md. 1, 12, 607 A.2d 537 (1992) (counsel fees may be obtained by an insured who succeeds in obtaining a declaratory judgment that liability policy provides coverage); *Northern Assurance Co. v. EDP Floors,* 311 Md. 217, 232, 533 A.2d 682 (1987) (insurer not liable for insured's attorney fees in declaratory judgment action seeking to establish duty to defend, where insurer's refusal to defend was not wrongful). *See also* Jane Massey Draper, Annotation, *Insured's Right to Recover Attorneys' Fees Incurred in Declaratory Judgment Action to Determine Existence of Coverage Under Liability Policy,* 87 A.L.R.3d 429 (1978).

JUDGMENT AFFIRMED IN PART AND MODIFIED IN PART; CASE REMANDED TO THE COURT OF SPE-

CIAL APPEALS WITH DIRECTIONS TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION, TO INCLUDE DETERMINATION WHETHER, UPON THE RECORD IN THIS CASE, ENDORSEMENT NO. 18 TO PARAGRAPH (k) OF THE UTICA POLICY PROVIDES COVERAGE OF $50,000 PER OCCURRENCE FOR DAMAGES TO BAUSCH & LOMB'S OWN PROPERTY. COSTS TO BE PAID BY BAUSCH & LOMB.