R & D Maidman Family L.P. v Scottsdale Ins. Co. (2004 NY Slip Op 24201)

R & D Maidman Family L.P. v Scottsdale Ins. Co.

2004 NY Slip Op 24201 [4 Misc 3d 728]

April 26, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Tuesday, November 9, 2004

[*1]
R & D Maidman Family L.P. et al., Plaintiffs,
v
Scottsdale Insurance Company et al., Defendants.
Supreme Court, New York County, April 26, 2004

APPEARANCES OF COUNSEL

Gallagher, Walker & Bianco, Mineola, for Scottsdale Insurance Company, defendant. Maidman & Mittelman, LLP, New York City, for plaintiffs. Jones Hirsch Connors & Bull P.C., New York City, for Greenwich Insurance Company, defendant.

{**4 Misc 3d at 729} OPINION OF THE COURT

Carol R. Edmead, J.
Plaintiffs, R & D Maidman Family L.P. and Fashion Wear Realty Co., Inc., commenced this breach of contract action against defendants alleging, inter alia, that defendants denied plaintiffs' insurance claim for costs incurred in erecting and maintaining a sidewalk bridge, scaffolding, and net meshing, in violation of their respective policy agreements insuring plaintiffs' building. Plaintiffs allege that such work was performed "in order to comply with the DOB's [New York City Department of Buildings] demands to prevent further damage to the [plaintiffs' building], adjacent properties, and persons."
Defendant Scottsdale Insurance Company now moves pursuant to CPLR 3212 for summary judgment against the plaintiffs on the ground that no triable issue of fact exists and pursuant to CPLR 3211 (a) (7), on the ground that plaintiffs' complaint fails to state a cause of action as against it. In response, plaintiffs cross-move for partial summary judgment pursuant to CPLR 3212 as to defendant's liability for sums expended by plaintiffs to remediate and mitigate further actual and imminent damage to third-party property and persons.
In support of its motion, defendant asserts the following undisputed facts:
Plaintiffs own the subject building, which is located at 113 West 42nd Street (the building).[FN1]

In January 2001, plaintiffs began demolition of the interior building as part of their plan to convert the building to a luxury residential apartment condominium. On May 22, 2001, a brick or piece of masonry dislodged from the exterior of the building, falling 20 floors and penetrating the roof of an adjacent one-story building known as 111 West 42nd Street (the adjacent building), owned by the Durst Organization.
As a result, both buildings were inspected by the New York City Department of Buildings, resulting in several "Environmental Control Board Notice[s] of Violation and Hearing" (notices of violation) issued to plaintiffs and one order to vacate issued to {**4 Misc 3d at 730}the Durst [*2]Organization. The notices of violation submitted in support allege, inter alia, that plaintiffs failed to maintain the building, and noted "concrete falling from all stories" on the east facade, that the structural arch is "pulling away from the main building," that the terra cotta caps are "in danger of falling," brick masonry bulged, loose and displaced.[FN2]

The notices of violation also ordered the plaintiffs to, inter alia, "protect the adjacent property" and make "immediate" and "necessary" repairs.
According to plaintiffs' complaint, the affidavit of Richard Maidman, and a statement by Mitchel Maidman,[FN3]

plaintiffs subsequently hired two contractors, who erected a sidewalk bridge, scaffolding and net meshing at the building's location. The sidewalk bridge was constructed in order to comply with the notices of violation, prevent further damage to plaintiffs' property, "the abutting properties and persons," and to continue with plaintiffs' conversion of their building to a residential condominium. In the fall of 2001, plaintiffs relinquished their plans to convert the building, and sold the building to the Durst Organization for $15 million.
Plaintiffs purchased from defendant a commercial general liability insurance policy (the CGL policy) covering the building for the period of December 11, 2000 through December 11, 2001, and seek in the present action to recover from defendant under the CGL policy the costs incurred in erecting and maintaining the sidewalk bridge, scaffolding and net meshing from May 25, 2001 through December 2001.
The CGL policy provides in relevant part:
"Section ICoverages
"1. a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies . . .
"b. This insurance applies to 'bodily injury' and {**4 Misc 3d at 731}'property damage' only if:
"(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; . . .
" 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."
"[Section VDefinitions, 13.]
" 'Property damage' means:
"a. Physical injury to tangible property, including all resulting loss of use of that property . . . or
"b. Loss of use of tangible property that is not physically injured . . .
"2. Exclusions
"This insurance does not apply to:
"a. Expected Or Intended Injury
" 'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured . . .
"j. Damage to Property
" 'Property damage' to:
"(1) Property you own, rent, or occupy . . . ."
As a result of the property damage to the adjacent building, the Durst Organization brought suit against, inter alia, plaintiffs. Plaintiffs called upon defendant to defend them in that action pursuant to the CGL policy. Defendant assigned defense counsel for plaintiffs and ultimately settled "the covered portion of that suit."
In support of its motion for summary judgment, defendants argue that as a matter of law, the alleged loss is not covered under the terms of the CGL policy. Here, it is argued that the complaint does not meet any of the requirements under which defendants must defend or indemnify, in that (a) there is no suit filed by a third party against the insured, (b) there is no suit alleging a claim for "bodily injury" or "property damage" as defined, and (c) the alleged injury or damage is not the result of an "occurrence," which is defined in the CGL policy as an "accident." Further, given that plaintiffs' suit is for the recovery of their own voluntary expenses in preserving their own building from further collapse, plaintiffs were never "legally obligated" to pay such sums for the "bodily injury" or "property damage" of a third party as proscribed by the CGL policy.
Additionally, defendants contend that the complaint should be dismissed since the alleged "costs" of the erection and maintenance{**4 Misc 3d at 732} of the sidewalk bridge, scaffolding and net meshing is not a "physical injury to tangible property" or "loss of the use of tangible property that is not physically injured," as defined in the CGL policy. Defendants argue that the falling brick or masonry did not cause the building conditions recited in the DOB violations. The "costs" plaintiffs seek to recover were "not the result of a specific occurrence or of a sudden happening" but were the result of decades of neglect and deterioration. Finally, defendants assert that plaintiffs' claim, that their "property damage" is the damage to their own building, is subject to an exclusion in the CGL policy, which expressly states that "[t]his insurance does not apply to . . . 'Property damage' to: (1) Property you own . . . ."
In response, plaintiffs cross-move for partial summary judgment, arguing that, under the CGL policy, expenses to prevent further damages after damage has been caused to third parties constitute damages incurred "because of property damage to which this policy applies," and that [*3]their claim is based on an "occurrence" defined by the CGL policy because the damages were neither intended nor expected by plaintiffs. In support, plaintiffs submit an affidavit of Mitchel Maidman, wherein he states that plaintiffs were not "aware of, or expected or anticipated the conditions described in the Violation Notices or Vacate Order." Mr. Maidman attests that the subject expenses were incurred for the purpose of complying with the notices of violation, and thus, protecting third parties from further property damage or personal injury resulting from falling debris from plaintiffs' building. According to plaintiffs, federal courts applying New York State law and sister state courts have concluded that similar policies containing similar provisions cover the policyholder's liability for expenses incurred to minimize further damages where actual damage to third parties has occurred, even though no third party has sued to recover them, and that such expenses are not excluded from such policy. Plaintiffs urge this court to adopt the rationale expressed in these cases that it would be an equivocal type of justice to require an insurance company to pay a certain sum of money in the event the inevitable occurred, and yet not be required to pay a smaller sum which plaintiffs actually expended to avoid the foreseeable inevitable catastrophe.
Plaintiffs also argue that their claim is based on an occurrence, namely, the falling of a brick from plaintiffs' building onto the adjacent property and the DOB's finding of an imminent{**4 Misc 3d at 733} danger to other persons and property. The fact that defendants settled the damage claim by the Durst Organization demonstrates that defendants acknowledged that there was an occurrence within the meaning of the CGL policy. Further, under New York law, defendants argue, damage results from an "occurrence" when it arises out of an unintended act, as opposed to an expected or intended one. Therefore, the allegation that plaintiffs neglected their property for many years is insufficient to support a finding that the falling of the brick was not an occurrence. Furthermore, defendants had a full opportunity to inspect plaintiffs' building before issuing the CGL policy, and cannot now be heard to argue that the building was uninsurable. Defendants maintain that there is no claim for damages incurred over a period of many years where the insured was on notice that its conduct was causing such damages. Rather, plaintiffs were required to erect the sidewalk bridge and scaffolding to protect the adjacent building and public.
In opposition to the cross motion and further support of their motion to dismiss, defendants add that the CGL policy also does not apply to "Expected or Intended Injury . . . property damage expected or intended from the standpoint of the insured." Defendants also assert that contrary to plaintiffs' claim that they were not aware of the conditions described in the notices of violation or the vacate order, on October 26, 1995, plaintiffs received a violation for failing to maintain the exterior building wall and for "loose masonry dislodge falling unto lower roof of [111 West 42nd Street]." Defendants also contend that the DOB previously issued numerous structural violations to plaintiffs for "concrete . . . loose, cracked," "east face of structure . . . portions are in danger of falling," and "roof terra cotta . . . is loose." Defendants also submit a report of Salamon Engineering Group, dated June 3, 1998, which considered a DOB violation dated December 4, 1992 for "loose and crumbling bricks and masonry blocks." Reports from two additional consulting engineers, dated June 1, 2001 and August 10, 2001, regarding plaintiffs' building state that the deterioration of the facade of the building is the result of the wear and tear and lack of maintenance and that the facade must be brought into a state of good repair as part of the "upcoming general renovation" to residential [*4]space. Defendants therefore maintain that plaintiffs cannot seriously argue that the brick falling was "unexpected, unusual and unforseen" since this same incident happened before. The true reason that the building required the scaffolding, {**4 Misc 3d at 734}netting and sidewalk bridge, defendants argue, is plaintiffs' neglect combined with the ongoing demolition and renovation of plaintiffs' building.
Defendants further insist that there must be damage to a third party in order for plaintiffs to recover remedial expenses undertaken on the insured's own property under a general liability insurance policy, and plaintiffs herein are not claiming damage to a third party. Defendants also argue that plaintiffs failed to cite one case whereby a policyholder of third-party liability insurance attempts to recover for costs incurred due to their own failure to maintain their property, and that the cases upon which plaintiffs rely are factually distinguishable. While first-party coverage pertains to loss or damage sustained by an insured to its property, the policy herein is for third-party coverage, and clearly states that "Commercial Property Coverage" is "not covered" (see OPS-D-1 of CGL policy declaration page).
In reply, plaintiffs contend that violations issued prior to 2001 were not in place at the time the brick allegedly fell on May 25, 2001, and the previous violations were on public record for defendant to review. Further, the condition of the building in 1998 is irrelevant, and is insufficient to prove that the falling brick, coupled with the DOB's orders, constituted "intentional conduct" under the CGL policy. Plaintiffs also point out that defendant did not deny coverage in the action by the Durst Organization on the basis of the exclusion for intentional conduct, and should be estopped from raising that argument herein. Plaintiffs also note that the consulting reports also confirm the emergency nature of the situation and the need for immediate preventive measures to be taken to protect the public from further possible harm. Further, any neglect of the building for "many years" as reported in no way suggests that plaintiffs intended a brick to fall and damage a third party, or would have known that such would occur. Plaintiffs also argue that the cases upon which defendants rely are inapplicable.

Analysis

It is well settled that where a defendant is the proponent of a motion for summary judgment, the defendant must establish that the "cause of action . . . has no merit" (CPLR 3212 [b]), sufficient to warrant the court as a matter of law to direct judgment in his or her favor (Bush v St. Clare's Hosp., 82 NY2d 738, 739 [1993]; Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]).
The novel issue presented herein is whether a third-party commercial general liability insurance policy provides indemnification{**4 Misc 3d at 735} for costs expended on the insured's property which are undertaken to mitigate or prevent further damage to third parties, after damage to a third party has occurred. As there is no New York case law on the precise issue presented here, the court examines the terms of the insurance policy at issue against general principles of insurance contract interpretation and the purpose of general commercial liability insurance contracts.
Well-established principles under New York law governing the interpretation of insurance contracts provide that the unambiguous terms of an insurance policy must be accorded their plain and ordinary meaning (2619 Realty v Fidelity & Guar. Ins. Co., 303 AD2d 299 [1st Dept 2003], citing West 56th St. Assoc. v Greater N.Y. Mut. Ins. Co., 250 AD2d 109, 112 [1st Dept 1998]; Mazzuoccolo v Cinelli, 245 AD2d 245, 246-247 [1st Dept 1997]). The [*5]interpretation of such provisions is a question of law for the court, and a court is not free to "make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation" (2619 Realty v Fidelity & Guar. Ins. Co., supra at 300; Chimart Assoc. v Paul, 66 NY2d 570, 572-573 [1986]; Mazzuoccolo v Cinelli, supra at 247; Breed v Insurance Co. of N. Am., 46 NY2d 351, 355 [1978]). Any interpretation of an insurance contract implicates as a standard "the reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract" (Hartford Underwriters Ins. Co. v American Intl. Group, 300 AD2d 24, 26 [1st Dept 2002]; Matter of Midland Ins. Co., 269 AD2d 50, 59 [1st Dept 2000]). Nevertheless, if there is ambiguity in the provisions of the policy, any doubt as to the existence of coverage must be resolved in favor of the insured and against the insurance carrier as drafter of the agreement (Westview Assoc. v Guaranty Natl. Ins. Co., 95 NY2d 334, 339 [2000]; United States Fid. & Guar. Co. v Annunziata, 67 NY2d 229, 232 [1986]; Atlantic Cement Co. v Fidelity & Cas. Co. of N.Y., 91 AD2d 412 [1st Dept 1983]). However, a contract is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms (Ruttenberg v Davidge Data Sys. Corp., 215 AD2d 191, 193 [1st Dept 1995], citing Federal Deposit Ins. Corp. v Herald Sq. Fabrics Corp., 81 AD2d 168, 180 [2d Dept 1981], lv dismissed 55 NY2d 602 [1981]).
According to the express terms of the CGL policy, defendant agreed to pay sums that plaintiffs became "legally obligated to pay as damages because of" property damage or physical injury to tangible property. However, the insurance applied expressly to {**4 Misc 3d at 736}property damage caused by an occurrence or accident to property not owned, rented or occupied by plaintiffs. There is no ambiguity regarding the language employed in the subject indemnity provisions. Rather, the parties dispute whether such indemnity provisions apply to the costs incurred by plaintiffs to cure notices of violation affecting third parties and property owned by third parties.
Whether the indemnity provision herein has been triggered is determined by a two-pronged test: first, whether the loss or costs incurred by plaintiffs are sums for which plaintiffs were legally obligated to pay as damages; and second, whether such legal obligation arises because of property damage to a third-party's property which was caused by an accident. Thus, notwithstanding the parties' arguments as to whether the costs herein are "damages" or "property damage," or the result of an "occurrence," the court concludes that it must first determine that the loss incurred by plaintiffs qualifies as sums plaintiffs have become legally obligated to pay as damages, that is to say, whether plaintiffs were legally obligated to pay such sums as damages. Only then does this court reach the issue of whether such legal obligation to pay was "because of" property damage to third-party property in which such property damage was "caused" by an occurrence.
There are no reported New York State court decisions on the issue of what constitutes "a legal obligation" for purposes of triggering the duty to indemnify remediation costs under a comprehensive general liability insurance policy. Plaintiffs insist that the DOB violations and imminent threat of danger to the public gave rise to their legal obligation to undertake the remedial efforts herein, whereas defendants argue that plaintiffs were never under a legal obligation to incur such costs as there is no pending underlying action related to plaintiffs' action. Almost all of the cases in sister state and federal courts in which an insurer was found obligated to indemnify an insured for remediation costs, including the cases upon which plaintiffs rely, [*6]involved situations in which there was some evidence of probable and/or imminent[FN4]

action by a third party. Having examined numerous sister state and federal cases exploring circumstances under which an insurer is obligated to indemnify its insured for remediation {**4 Misc 3d at 737}costs it incurs to protect third-party property, this court determines "the reasonable expectation and purpose" of the insurer's agreement to indemnify plaintiffs for sums they are "legally obligated to pay as damages" is to cover costs plaintiffs incur for remedial work which may be subject to an adversarial proceeding to enforce remedial work or recover such remedial costs. Thus, coverage under the CGL policy for remediation expenses incurred by plaintiffs in connection with plaintiffs' own property to prevent further damage to property of a third party is not recoverable under the circumstances presented.
Requiring that the insured's "legal obligation" to remediate arises from an action or immediate threat of action to enforce remedial action or recover costs for remedial expenses so as to render the remedial actions is not unheard of.
In Bausch & Lomb Inc. v Utica Mut. Ins. Co. (330 Md 758, 764, 625 A2d 1021, 1024 [1993]), the policy at issue provided that 
"[t]he company [Utica] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage." 
The court was called to decide whether the insurer must defend or indemnify the insured as a consequence of groundwater pollution discovered on its industrial site, which involved expenses of removing soil contaminated with hazardous chemicals. The insured initiated the cleanup without legal proceedings having been formally filed against it by a third party, and without a written administrative directive by a government agency that it take such action. Neither the State nor any adjacent landowner sued the insured for money damages or for injunctive relief. Nor did the State file administrative proceedings against the insured, or order it to clean up its facility. Further, the federal Environmental Protection Agency never sent a letter to the insured designating it as a "potentially responsible party" in regard to the pollution at its facility.
In determining whether the insurer was obligated to indemnify the insured for expenses incurred by the insured in removing soil contaminated with hazardous chemicals, the court explored whether the insured "shall become legally obligated to pay" for such expenses. Looking to the evidence at trial concerning the interaction between the insured and the State in regard to {**4 Misc 3d at 738}the cleanup, the court noted that the insured acted in a cooperative manner with state regulators in assessing the pollution's extent and devising plans to treat it. However, the evidence was unclear as to whether the insured acted purely voluntarily in doing so. In this regard, the relevant environmental statutes imposed strict liability upon the owners of polluted property, and the statutes further granted the State the authority to enforce the laws either by administrative order, by injunction, or by the State's own, direct remediation at the owner's expense. "The tacit threat" [*7]of formal state intervention was thus always present in (the insured's) dealings with the state regulators (330 Md at 780, 625 A2d at 1032). The court also noted that the state regulators reviewed and approved the insured's studies and subsequent remediation program and implicit in their approval was the power to disapprove, and demand that more be done. Although the state agents did not adopt "an overtly adversarial and coercive posture towards" the insured (330 Md at 780, 625 A2d at 1032), did not sue the insured, and issued no order, the insured ultimately faced the task of complying with the environmental laws, and paying the costs of compliance. As such, the insured's response costs, undertaken in the regulatory context, represented a sum the corporation was legally obligated to pay.
In Hazen Paper Co. v United States Fid. & Guar. Co. (407 Mass 689, 693, 555 NE2d 576, 579 [1990]), the court determined that if the insured is legally liable to pay certain amounts because of property damage for which the law holds it responsible, and the insurer is legally obligated to pay "damages on account of . . . property damage," the insured has policy coverage subject to other policy provisions. In Hazen, the court found that the insured had "no practical choice other than to respond actively to the letter" by the Environmental Protection Agency which set forth a claim for damages based on property damage (407 Mass at 697, 555 NE2d at 582; cf. M & M Elec. v Commercial Union Ins. Co., 241 AD2d 58, 59 [2d Dept 1998] [where third party claimed to have incurred property damage as a result of an occurrence and unilaterally withheld certain sums to which the insured would otherwise have been entitled, "no such 'legal obligation to pay' " had arisen since there is no indication that the third party ever obtained a judgment against the insured]).
Although in the context of determining whether an insurer had a duty to defend, which is broader than the duty to indemnify {**4 Misc 3d at 739}(Seaboard Sur. Co. v Gillette Co., 64 NY2d 304 [1984]; International Paper Co. v Continental Cas. Co., 35 NY2d 322, 326 [1974]), the following cases lend support to the notion that in order to find that the insured was legally obligated to undertake such corrective measures, the remedial measures for which indemnification is sought must have been performed under the threat of adversarial action enforcing the remedial measures or costs thereof. Cases involving the issue of an insurer's duty to defend are called upon to analyze the facts of an underlying action to determine whether they fall within, or potentially within, the policy's coverage, and are instructive to this court's determination as to whether the alleged damages here, to wit: the alleged remedial costs, fall within the CGL policy at issue.
In Ryan v Royal Ins. Co. of Am. (916 F2d 731, 733, 735 [1st Cir 1990]), the terms of the policy therein required the insurer to defend the insured in respect to "any suit . . . seeking damages" and to indemnify the insured for amounts the insured is "legally obligated to pay." The court held, in relevant part, that the insurer had no obligation to indemnify the insured as "there was no 'suit' against the insureds" (at 743). The court continued, the insured "never became 'legally obligated to pay as damages' any 'sums' on account of [the third party's] 'claim' " (at 743). Further, the "damages" for which indemnity was sought
"did not result from [the third party's] demands or its assumption of an adversarial stance; rather the damages arose in consequence of a private market transaction, albeit one influenced indirectly, perhaps, by potential public liability. Such losses, whether or not economically real, cannot form the basis for an indemnity claim against an insurer under the provisions of a [commercial general liability] policy" (916 F2d at 743).
In Avondale Indus., Inc. v Travelers Indem. Co. (887 F2d 1200 [2d Cir 1989]), the Second Circuit, interpreting New York contract law, concluded that a letter from the Louisiana Department of Environmental Quality (LDEQ) constituted a suit for purposes of crossing the [*8]coverage threshold. There, LDEQ made a formal "demand" for "immediate action" to clean up a hazardous waste site and ordered the insured to attend a meeting or face the institution of suit. Due to the adversarial nature of LDEQ's demand letter, the Avondale court found that there was an {**4 Misc 3d at 740}adversarial posture assumed in the coercive demand letter that Avondale received (Avondale, supra at 1206), and inasmuch as the insured might be held liable for clean-up costs, the insured was obliged to defend. Further, viewed from the insured's perspective, "an ordinary businessman reading this policy would have believed himself covered for the demands and potential damage claims now being asserted in the DEQ administrative proceeding" (Avondale, supra at 1207 [emphasis added]).
The notices of violation at issue contain no language threatening to hold plaintiffs liable for the costs in curing the violations. The notices of violation do not form a basis to conclude that plaintiffs ultimately faced the task of complying with the remedial directives or paying the costs of compliance. According to the notices of violation, plaintiffs are "ordered" to remedy the violations and certify that they are in compliance "with the requirements of law" by way of a certificate of correction. However, the notices of violation also provide that if the DOB does not receive a certificate of correction, plaintiffs must appear at a hearing scheduled on the dates and times noted. Plaintiffs' failure to appear would result in a "default" and subject plaintiffs "to maximum penalties." The "maximum penalty" for the offense under Administrative Code of the City of New York §§ 27-127 and 26-127 as charged against plaintiffs is "a maximum $2,500.00 penalty for each violation." Thus, any failure of plaintiffs to remedy the violations would not result in liability for remedial costs either imposed by the DOB or as a result of any proceeding by DOB, but instead, would result in a fine. Unlike "response costs" for which indemnification is often sought in environmental pollution cases, fines for violations are not damages in this context (see A.Y. McDonald Indus., Inc. v Insurance Co. of N. Am., 475 NW2d 607 [Iowa 1991] [civil penalties assessed under statute which imposes fines for violations against insured are not "damages" after comparison with CERCLA[FN5]

which imposes liability on parties responsible for response costs]; Independent Petrochemical Corp. v Aetna Cas. & Sur. Co., {**4 Misc 3d at 741}944 F2d 940 [DC Cir 1991] [stating that liability for environmental response costs is similar to compensation placing the individual in the position that he would have been in had the injurious action not occurred; this is how "damages" is ordinarily understood; a fine or penalty, [*9]in contrast, is not understood to be dollar-for-dollar recompense, but rather is a pecuniary form of punishment for the commission of an act society finds repugnant and seeks to deter]).
Thus, it cannot be said that the notices of violation issued herein gave rise to a legal obligation on the part of plaintiffs to bear the costs for remedial work for purposes of triggering a duty of defendants to indemnify plaintiffs under the CGL policy at issue.
Plaintiffs cite a plethora of cases from various jurisdictions in support of their position that the expenses incurred herein, undertaken to protect a third party from further or additional injury, are "damages." In this respect, for the proposition that the CGL policy covers plaintiffs' liability for expenses incurred to prevent, minimize or mitigate further damage where actual damage to third parties has occurred, plaintiffs cite to Leebov v United States Fid. & Guar. Co. (401 Pa 477, 165 A2d 82 [Pa 1960] [expenses in arresting a landslide and preventing further damage to nearby third-party property]); Aetna Ins. Co. v Aaron (112 Md App 472, 685 A2d 858 [1996] [repair of greenhouse leaks to prevent further damage to adjoining property owners]); American Economy Ins. Co. v Commons (26 Or App 153, 552 P2d 612 [1976] [fire suppression costs covered]); Globe Indem. Co. v State (43 Cal App 3d 745, 118 Cal Rptr 75 [1974] [same]); and Goodyear Rubber & Supply, Inc. v Great Am. Ins. Co. (545 F2d 95 [9th Cir 1976] [salvage claim arising from preventing fire consumption of a burning barge is recoverable]).
Plaintiffs also argue that coverage for their remedial costs under the CGL policy is permitted even though the work was performed on their own property (see Avondale Indus., Inc. v Travelers Indem. Co., 887 F2d 1200 [2d Cir 1989]; Savoy Med. Supply Co. v F & H Mfg. Corp., 776 F Supp 703 [ED NY 1991]; see also Bankers Trust Co. v Hartford Acc. & Indem. Co., 518 F Supp {**4 Misc 3d at 742}371 [SD NY 1981], vacated on other grounds 621 F Supp 685 [SD NY 1981]; Agway, Inc. v Travelers Indem. Co., 1993 WL 771008, 1993 US Dist LEXIS 21092 [ND NY, Dec. 6, 1993]; AIU Ins. Co. v Superior Ct., 51 Cal 3d 807, 799 P2d 1253 [1990]).
However, such cases are significantly distinguishable from the case at bar, either because of the ongoing nature of the damage producing event, or the fact that the insured ultimately faced the consequence of bearing the remedial costs as a result of the enforcement of statutory or contractual liability in those cases.
For example, in Leebov v United States Fid. & Guar. Co. (401 Pa 477, 165 A2d 82, supra), the insured was engaged in excavating along a hillside when a break occurred at the rear of the property causing a landslide and resulting damage to a nearby house. The insured immediately took measures to arrest the landslide, and incurred expenses in repairing the damage and preventing further damage. The insured had to pay $1,700 as the result of a lawsuit brought by the damaged property owner, and paid additional costs to arrest the landslide, repair the damage done and prevent further damage. With respect to the remedial measures, the insurer argued, among other things, that there was no proof of the insured's negligence, and therefore, the insured was not obliged under the law to perform the remedial measures. Rejecting this argument, the court held that the insurer "ignore[d] the fact that the plaintiff [insured] was absolutely liable for damages to the nearby lands in their natural state resulting from interference with their lateral support" and would be liable for damages to third parties resulting from negligence attributable to the insured by failing to "meet a peril he could not mistake" (401 Pa at 481, 165 A2d at 84). Unlike the portion of the insured's remedial expenses incurred in arresting the landslide, [*10]in the instant case, plaintiffs' expenditures were not incurred during the happening of the brick-falling occurrence (see also Goodyear Rubber & Supply, Inc. v Great Am. Ins. Co., 545 F2d 95 [1976], supra [insurer obligated to pay costs incurred by salvage claimant who removed a burning barge to safety during a fire since insurer insured against damage caused by the explosion and fire which set the salvage operation in motion; the loss prevented by the rescue was covered by the policy]). Further, the expenses incurred by the insured in Leebov included expenses to repair damage created by the incident, whereas the expenses incurred by plaintiffs herein are to repair damage to their building which were not created by the brick-falling incident.{**4 Misc 3d at 743}
The court in Leebov also noted earlier in its decision that unlike the language of a policy in another case containing the language employed in the CGL policy here, the policy under its consideration "is not so limited" given that the insurer agreed to pay such sums as the plaintiff became obligated to pay "by reason of" the liability imposed upon him by law for damages because of injury to or destruction of property (401 Pa at 480, 165 A2d at 84). In light of the distinction made by the Leebov court as to the terms of the policy before it, and the manner in which the expenses were incurred in Leebov, there is little reason for this court to extend Leebov's holding and rationale to the case at bar.
Also, in Aetna Ins. Co. v Aaron (112 Md App 472, 685 A2d 858, supra), a condominium association sought to recover costs it incurred in repairing the insured's property to prevent further damage to the common areas as well as property of another condominium unit owner as a result of intermittent water leaks onto such areas which occurred over a period of eight years. The association alleged that the insured was contractually obligated to repair his property that caused damage to the property of others. In determining whether the insurer had a duty to indemnify, the court looked to the policy to determine whether the scope of the insurer's liability coverage extended to expenses incurred by an insured to remediate a hazardous condition on the insured's property, for the purpose of preventing imminent and further harm to third-party property. The court stated that under certain circumstances, an insurer may be obligated to indemnify its insured for remediation expenses incurred in connection with the insured's property. The court concluded that if the insured's property caused damage to third-party property, and there was imminent risk of additional harm if preventive measures are not implemented, and the insured had a duty to remediate, the policy protects the insured for the costs of necessary remedial measures to the extent that such repairs were not merely to benefit the insured's property.
This court also declines to extend Aaron's holding to the case at bar. The single "brick falling" incident alleged in plaintiffs' complaint here does not, by any stretch of the imagination, compare with the type of "imminent risk of additional harm" created by the intermittent ongoing water damage existing in Aaron (see also Bankers Trust Co. v Hartford Acc. & Indem. Co., 518 F Supp 371 [1981], supra [insurer conceded that substantial oil seepage from insured's property would continue to {**4 Misc 3d at 744}third-party property in the event remedial, preventative work on insured's property not performed]).
Unlike the insured's duty in Aaron, plaintiffs' alleged "duty to remediate" does not arise from either a legal or contractual obligation so as to render the remedial work involuntary. In Aaron, the insured was allegedly under a contractual obligation to repair his property to prevent further damage to third-party property, which clearly does not exist here. Rather, plaintiffs' duty [*11]to mitigate here allegedly arises from the notices of violation issued by the DOB with whom plaintiffs have no contractual relationship. Further, the notices of violation do not form a basis to compel plaintiffs to ultimately bear costs for remediation costs.
American Economy Ins. Co. v Commons (26 Or App 153, 552 P2d 612 [1976], supra) and Globe Indem. Co. v State (43 Cal App 3d 745, 118 Cal Rptr 75, supra) involved cases in which fires broke out on the insured's property, and spread causing damage to and endangering third-party property. The State of Oregon and the State of California, respectively, brought actions under state statutes to recover costs the states incurred in fighting the fires. The insurers were found obligated to satisfy any money judgment awarded against insureds for fire suppression costs, under the theory that such fire suppression costs were collectable under the relevant state statutes. In Globe, the court analyzed whether the fire suppression costs were costs collectible under California's Health and Safety Code for which the insured was legally obligated to pay because of damage to tangible property. The court determined that since liability for fire suppression costs under such code could arise under the circumstances presented therein, it could be said that the insureds became legally obligated to pay such fire suppression costs because of property damage (see also American Economy Ins. Co. v Commons, 26 Or App at 157, 552 P2d at 613 ["the insurers are liable for the suppression costs since the insureds' liability arose because of the state's action" under the Oregon Revised Statutes]).
In Avondale Indus., Inc. v Travelers Indem. Co. (887 F2d 1200 [2d Cir 1989]) the court found that remedial costs expended by the State that potentially may be assessed against the insured were damages within the meaning of the policy because the demand letter calling for remedial efforts or payment of costs to remediate acted to commence a formal proceeding against the insured. The court found that the remedial costs incurred {**4 Misc 3d at 745}by the insured were "damages" under New York law inasmuch as the insured might be held liable for clean-up costs sought to be recovered in the State's administrative proceeding instituted to recover its clean-up expenses.
Again, the notices of violation at issue form no basis for a cause of action by DOB to compel plaintiffs to bear the costs of remedying their building (cf. Agway, Inc. v Travelers Indem. Co., 1993 WL 771008, 1993 US Dist LEXIS 21092 [ND NY, Dec. 6, 1993] [damages encompass environmental clean-up costs under New York law where insured was subject to a suit under CERCLA which imposed statutory liability for environmental clean-up costs upon the insured]; Savoy Med. Supply Co. v F & H Mfg. Corp., 776 F Supp 703 [ED NY 1991] [insurer had duty to defend a CERCLA action against insured despite owned property exclusion where insured was subject to liability under CERCLA for clean-up cost]; Independent Petrochemical Corp. v Aetna Cas. & Sur. Co., 944 F2d 940 [DC Cir 1991] ["damages" awarded against insured include sums representing the cost of remedying environmental harm for which the insured is legally responsible where federal and state government undertook environmental clean-up activities and sought reimbursement under CERCLA]; Chesapeake Util. Corp. v American Home Assur., 704 F Supp 551 [D Del 1989] [environmental contamination claims asserted by governmental entities against insured for clean-up costs, and sought recovery from various insurance companies]; Port of Portland v Water Quality Ins. Syndicate, 796 F2d 1188, 1192 n 1 [9th Cir 1986] [coverage found where the insured sought recovery for costs expended in containing and cleaning up oil slick on public water as "polluter does not have a choice under the (remedial statute) to choose not to clean up (the spill)"]; AIU Ins. Co. v Superior Ct., 51 Cal 3d 807, 274 Cal [*12]Rptr 820 [1990] [insurers are obligated to provide coverage to insured for clean-up and other "response" costs incurred pursuant to CERCLA and related state and federal environmental laws]; Outboard Mar. Corp. v Liberty Mut. Ins. Co., 154 Ill 2d 90, 607 NE2d 1204 [1992] [governmental agencies brought separate actions against insured for response costs and damages for injuries to natural resources pursuant to CERCLA; pursuant to a resulting consent decree, the insured was required to make payments for the costs associated with the cleanup of the waters]; A.Y. McDonald Indus., Inc. v Insurance Co. of N. Am., 475 NW2d 607 [Iowa Sup Ct 1991] [costs incurred under CERCLA to pay for response costs as a result of pollution are covered as {**4 Misc 3d at 746}damages in CGL policies]; Minnesota Min. & Mfg. Co. v Travelers Indem. Co., 457 NW2d 175 [Minn 1990] [the insureds are under a legal obligation to expend amounts mandated by environment protection statute to remedy injuries to the third-party property]; C.D. Spangler Constr. Co. v Industrial Crankshaft & Eng'g Co., Inc., 326 NC 133, 388 SE2d 557 [1990] [clean-up costs incurred pursuant to the State's compliance order under the state statute imposing a remedial plan are "damages" within the meaning of the policy]; Boeing Co. v Aetna Cas. & Sur. Co., 113 Wash 2d 869, 784 P2d 507 [1990] [response costs incurred by insured under CERCLA to clean up hazardous waste sites covered under CGL policies]; Compass Ins. Co. v Cravens, Dargan & Co., 748 P2d 724, 728 [Wyo 1988] [where rules and regulations provided that the insured was responsible for the cleanup of the discharged oil, insured had the legal liability to clean up the oil spill despite the absence of any claim against the insured, and insured is obligated to pay for "these damages"; however, policy to pay for damage to property of others did not cover clean-up costs incurred on insured's property]).
The case law finding coverage in favor of the insured reflects that not only was there a continuing harm that needed to be alleviated, there was a statute giving rise to the insured's responsibility for costs incurred in alleviating the damage, whether it was performed by the insured or a third party. All of the costs for which the insureds were possibly liable in the cases cited by plaintiffs, and thus recoverable from the insurer, were costs sought in a third-party suit or proceeding for repairing damage to third-party property or costs incurred to prevent damage previously confined to the insured's property from spreading to government or third-party property. The costs consisted of sums to reimburse government agencies and comply with injunctions that ordered cleanup under CERCLA and similar statutes creating liability for response costs. Further, the government or third party had the authority to commence a civil action or proceeding to enforce the corrective measures necessary to protect the environment pursuant to statute or regulation (New Castle County v Hartford Acc. & Indem. Co., 673 F Supp 1359 [D Del 1987]). Additionally, since the required remedial actions were ultimately enforceable in a legal proceeding, they constituted sums that the insured was legally obligated to pay as damages (see New Castle County, 673 F Supp 1359 [1987], supra).{**4 Misc 3d at 747}
It has been stated that "the area of environmental damage presents unique questions for insurance coverage because there is always the potential that contamination will spread. As a policy matter, it is more desirable to take remedial action as soon as possible, rather than waiting until off-site environmental harm has occurred" (Aetna Ins. Co. v Aaron, 112 Md App at 500, 685 A2d at 872, quoting Patz v St. Paul Fire & Mar. Ins. Co., 817 F Supp 781, 784 [ED Wis 1993]). However, such sound public policy considerations in support of finding coverage in environmental pollution cases, or analogous fire suppression or water damage cases, are simply inapplicable in cases such [*13]as the one facing this court, where there is a single brick-falling incident. It is not alleged that plaintiffs incurred costs in arresting or stopping a downpour of falling bricks. This case involves costs incurred to prevent the possibility of additional damage after a single brick-falling incident, which cannot be characterized as an ongoing occurrence or continuing harm which must be diffused as in the case of oil spills, fires, or water leakages.
The absence of such ongoing, continuing damages and statutorily imposed liability for remedial costs, considered in light of the purpose of a commercial general liability policy which is to provide coverage for tort liability for physical damage to others (see Hartford Acc. & Indem. Co. v Reale & Sons, 228 AD2d 935 [3d Dept 1996]), renders coverage in this case unwarranted. As such, plaintiffs have failed to satisfy the first prong of the two-pronged test.
In any event, the court determines that plaintiffs would likewise fail to satisfy the second prong of the test. Although the fallen brick incident may have provided an occasion for DOB to inspect the building, it cannot be said that the damage to the adjacent building was the basis of DOB's remedial orders. Notably, the notices of violation here were issued (1) "because of" the condition of plaintiffs' building, and (2) "because of" the possibility of future harm to third parties. There is no mention of the prior brick-falling incident. Thus, the notices of violations were not issued "because of" the "property damage" that was caused by the fallen brick "occurrence."
The court further notes that the DOB previously issued notices of violation to plaintiffs, dated October 26, 1995 and March 4, 1996, for "failure to maintain" the building, in that certain portions of the building were "in danger of falling," the roof terra cotta "copping" was loose, and, on March 4, 1996, required plaintiffs to "make all repairs as required." The DOB could have {**4 Misc 3d at 748}issued the remedial orders to remedy the building in the absence of any previous damage to the adjacent building or harm to a third party (see Bankers Trust Co. v Hartford Acc. & Indem. Co., 518 F Supp 371, 374 n 2 [SD NY 1981], vacated on other grounds 621 F Supp 685 [SD NY 1981] [rejecting insured's argument that because the Coast Guard ordered them to clean the oil out of the soil on their own property, the cost of this work was an amount they were obligated to pay for damages to the property of third persons; Coast Guard may have ordered the insureds to correct a condition which had caused damage to their own property only]).
In light of the above, this court finds that defendant Scottsdale was not obligated to indemnify plaintiffs for the costs they incurred in remedying their building as alleged. As such, there is no basis to find that defendant Scottsdale breached the CGL policy in this regard, and plaintiffs' complaint alleging otherwise is without merit.
For the foregoing reasons, the motion by defendant Scottsdale Insurance Company pursuant to CPLR 3212 for summary judgment against the plaintiffs on the ground that no triable issue of fact exists is granted, and the court's decision does not rest on CPLR 3211 (a) (7). Plaintiffs' cross motion for partial summary judgment pursuant to CPLR 3212 as to defendant's liability is denied.

Footnotes

Footnote 1: Defendants contend that plaintiffs were engaged in purchase negotiations for several years on an "on and off basis" with the Durst Organization, a rival real estate owner.

Footnote 2: The May 25, 2001 notice of violation, for example, states in pertinent part, "Chunks of Concrete in which Encase steel Beam [stiffeners] and Fire Escape Platforms are Falling off Said beams and hitting adjacent Propertys [sic] Roof causing damage To Roof. Concrete falling from all stories creating a hazardous condition . . . remedy. provide structural Engineers Report For Entire East Facade. protect Adjacent property + make all Necessary Repairs."

Footnote 3: Mitchel Maidman is a general partner of R & D Maidman Family L.P. and the president of plaintiff Fashion Wear Realty Co., Inc. (see affidavit of Mitchel Maidman).

Footnote 4: Imminent has been defined as "of an event, etc. (almost always of evil or danger); impending threateningly; hanging over one's head; ready to befall or overtake one; close at hand in its incidents; coming on shortly" (Compact Oxford English Dictionary 818 [2d ed 1991]).

Footnote 5: CERCLA, the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 USC § 9601 et seq.), was enacted in response to this nation's "well-publicized toxic waste problem" (United States v Wade, 577 F Supp 1326, 1330 [DC Pa 1983]). CERCLA provides that potentially responsible parties, to wit: present or past owners or operators of facilities that accepted hazardous substances, and generators or transporters of hazardous substances shall be liable for: "(A) all costs of removal or remedial action incurred by the [federal or state government] or an Indian tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . ." (42 USC § 9607 [a] [4]). CERCLA permits a private party to be reimbursed for all or some of the costs already incurred in response to contamination and permits a declaratory judgment allocating future response costs between potentially responsible parties (42 USC § 9613 [g] [2]).